STATE, Respondent, *v.* OLSON, Appellant.

(No. 6,614.)

(Submitted April 8, 1930.   Decided May 13, 1930.)

[287 Pac. 938.]

*Mr. K. W. McPherson* and *Mr. S. P. Wilson*, for Appellant, submitted a brief and argued the cause orally.

*Mr. L. A. Foot*, Attorney General, *Mr. T. H. McDonald*, Assistant Attorney General, and *Mr. E. W. Keeley*, County Attorney of Powell County, for the State, submitted a brief; *Mr. Keeley* argued the cause orally.

MR. JUSTICE GALEN delivered the opinion of the court.

The defendant was charged and convicted by a jury of the crime of robbery. Pursuant to the jury's verdict finding him guilty and leaving punishment to be fixed by the court, by its judgment the court sentenced him to ten years' imprisonment in the state prison at Deer Lodge. He moved for a new trial which was denied, and is now before this court on appeal from the judgment and from the court's orders denying him a new trial.

It appears that one John Anderson was and had been a resident of the city of Deer Lodge for more than thirty years, and for a period of about four years preceding the robbery had been intimately acquainted with the defendant. Anderson was the section foreman for the Northern Pacific Railway Company at Deer Lodge and lived in the section-house along the railroad right of way. He had been married and raised a family, but at the time involved herein was living apart from his wife, and the only member of his family then residing in Deer Lodge was his daughter Lola Anderson, unmarried, who lived with him.

In 1927, Anderson claims to have loaned the defendant $624, which was never repaid, and on account thereof Anderson claimed a lien or an interest in a Willys Knight automobile owned by the defendant; on account whereof, on September 17, 1928, the defendant Anderson, and Anderson's daughter Lola went together from Deer Lodge to Anaconda and there traded

the Willys Knight automobile to Lombardy, an automobile dealer, for a new car of the same make, the cost of which was $2,880, less $744.45 allowed on the trade-in of the old car, which balance was paid by Anderson. A license was issued for the new car in the name of John Anderson by the register of motor vehicles in Deer Lodge, and the car was kept in the possession of the defendant until April 8, 1929, twenty days prior to the robbery. Anderson never drove either car, but the defendant and Lola Anderson both drove the new automobile with John Anderson's knowledge, and he had ridden in it with both of them. The upkeep of the new car was paid by the defendant while it was in his custody. Anderson asked the defendant for possession of the automobile early in April, 1928, but the defendant refused, and Anderson thereupon recovered it with Sheriff Boedecker's assistance on April 8, 1928. It was, on that date, taken by the defendant, in company with the sheriff and Anderson, to the Chevrolet garage in Deer Lodge and left there for repairs. At the time the car was taken from the defendant he was very angry, cursed and swore, and said, "Anderson will pay for this"; that he would get even.

On April 19, 1929, the defendant and John Anderson went to the Chevrolet garage, and Anderson then and there paid in currency the repair bill amounting to $75. In paying the amount due Anderson was required to take his pocketbook from his inside vest pocket and to pay with currency taken therefrom, thus exhibiting his money. He testified that after paying the bill he had $320 left in his pocketbook, which, in the pocketbook, he replaced in his inside vest pocket, the defendant being at the time present, and that he never afterwards prior to the robbery had occasion to remove the pocketbook from his vest pocket. On Sunday evening, April 28, 1929, Anderson started for his home from Brown & Estill's cigar store in Deer Lodge at about 10 o'clock accompanied by one Andy Birk, a fellow employee of the Northern Pacific Railway Company, his home being about ten minutes' walk from that point. It was quite dark, there being no moon up at the time, and it was raining.

From the business district they proceeded south down past the penitentiary buildings, thence over a bridge crossing the Deer Lodge River, to the railroad tracks. At Conley's warehouse by the railroad track, Andy Birk left him and he proceeded on alone along the tracks going towards his home. When at a switch about 300 yards from where he left Birk, he was held up by two masked men armed with pistols, who knocked him down, cut out the right side of his vest where he kept his pocketbook, and, after abstracting his wallet and contents, departed.

Describing the robbery, Anderson testified: "As I came to where these fellows were I heard one of them say, 'that is him'; and then one of the fellows ran by me and closed in on me from the back, and the other fellow in front of me. They both had guns. Then the fellow behind me hit me in the head three or four times and knocked me down. * * * When my money was taken, they tore the side out of my vest and took half the vest with it." The mutilated vest worn by him was identified and introduced in evidence. The witness testified that he recognized the defendant as one of his assailants by his voice, the manner in which he ran away from the scene, by his face and stature and the shoes he wore. Prior to the robbery Anderson's daughter Lola had stayed at the defendant's house and kept her clothes there with Anderson's knowledge, and it was sought by the defendant to show that she sustained illicit relations with him.

In the bureau drawer of the room wherein the defendant slept, at the house occupied by him as a residence, the day following the robbery, at the time the defendant was placed under arrest, the sheriff found a .38 caliber Colt's automatic pistol, and some cinders were found in the breach block thereof; in a room adjoining the room in which the defendant slept were found two large blue handkerchiefs, the ends of which were wrinkled indicating that they had been tied; and in the room occupied by the defendant, alongside his bed, was found a pair of black oxford shoes, belonging to the defendant. The testi-

mony showed that these shoes resembled the ones worn by the defendant at the time of the robbery; one of such shoes was found to be full of water and there were cinders sticking to both shoes, and the dry one was covered with blood, which a chemist from the Montana State College at Bozeman examined and determined to be human blood.

We have given most careful consideration to each of the defendant's fifty specifications of error in the light of the record, and believe the only questions deserving of notice in disposition of this appeal are two in number, as follows: (1) Is there sufficient evidence to go to the jury to establish the fact that the defendant took from the person of John Anderson the sum of $320, or any other amount? (2) Did the court err in permitting the jury to take the exhibits in the case to the jury-room?

1. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (Sec. 10973, Rev. Codes 1921.)

It is conceded that all elements of crime have been established, ▆ except the felonious taking of any property from the person of John Anderson. In this connection defendant's learned counsel contend that the record is barren of any testimony to show that the sum of $320, or any other amount, was taken from the person of John Anderson, although admittedly he was held up at the point of pistols and assaulted. This point was made the basis of the defendant's motion to dismiss the case and to discharge the defendant at the conclusion of the evidence submitted in support of the information. It is urged that, while the complainant is shown to have had $320 in his pocketbook, which he kept in the inside of his vest nine days prior to the robbery, it does not appear that the pocketbook and money were actually in his vest when the assault was made upon him. Anderson testified: "After I paid this bill I had $320 left in the pocket-book, as well as a few railroad checks and a few interest deposit checks or certificates of

deposit. After paying the bill I put the pocket-book back in my inside pocket. At that time Harry Olson and the garage man who receipted my bill were present. I left the car there then and went out. From that time on, as far as I know, the pocket-book was not out of my pocket. * * * I carried the pocket-book which I had in my inside vest pocket every day. * * * When my money was taken they tore the side out of my vest and took half the vest with it. I had the vest to the suit I now have on on that night, and I would recognize the vest if I saw it again. This vest which you hand me, State's Exhibit 2 for identification, is the vest I had on that night. * * * The vest is in the same condition it was on the night of April 28, 1929, except that it was torn that night, but it is in the same condition now that it was immediately after the robbery.''

The rule is that once a fact is established inferences follow from it in proportion to the circumstances by which it is surrounded. One ever-present inference results as soon as a fact is proven to exist; namely, that as soon as it passes from the now to the then, so soon as it has passed from the present it is presumed to have remained as proven to exist until the contrary is shown. (The Blue Book on Evidence, Jones Commentaries on Evidence by Horwitz, sec. 58A; sec. 10C06, subd. 32, Rev. Codes 1921.) Here the evidence is undisputed that Anderson was assaulted, knocked down, and badly bruised; the vest pocket where he kept his wallet was cut out, and it is established that nine days before the robbery he had the sum of $320 in his wallet when it was last inspected, and that he kept the wallet containing his money in the inside pocket of his vest. In our opinion the evidence is sufficient to establish the fact that Anderson in fact carried the money in his inside vest pocket, and that it was there at the time the robbery was committed.

2. The record discloses that certain of the exhibits in the ▮▮▮ case were by the court permitted to be taken by the bailiff to the jury-room at the jury's request, the defendant

not being present at the time the order was made, although his counsel was present and consented. Counsel for the defendant assigns this proceeding as reversible error. The record recites the following: "Now, after the jury has retired to consider its verdict, comes the county attorney and comes the counsel for the defendant, the defendant not being present, and the court is informed by the bailiff that the jury now deliberating on this case have requested that all the exhibits in this case, including the gun, the handkerchiefs, the shoes and the vest, be sent to them in their jury-room, and counsel for the state and counsel for the defendant agree that this may be done; and now, upon this consent being given by both counsel in the case, these exhibits are given in charge of the bailiff with directions to deliver them to the jury now deliberating on this case in their jury-room."

It is argued that the defendant's counsel, in the defendant's absence, could not consent to having the exhibits go to the jury-room; that such proceeding was a substantial part of the trial of such character as to require the defendant's presence. The statute requires the personal presence of the defendant "at the trial" in felony cases (sec. 11931, Rev. Codes 1921); and authorizes the jury to take "with them all papers (excepting depositions) which have been received as evidence in the cause" upon retiring to deliberate upon a verdict (Id., sec. 12011). The proceeding by which the court permitted the exhibits to be taken to the jury-room did not in any sense constitute a part of the trial of the action. (*State* v. *Spotted Hawk*, 22 Mont. 33, 55 Pac. 1026; *State* v. *Hall*, 55 Mont. 182, 175 Pac. 267.) The exhibits had been regularly received in evidence while the accused was personally present with his counsel, and, in our opinion, under the circumstances in no sense did the action of the court so taken without the defendant's presence constitute part of the trial within the meaning of the statute requiring the personal presence of the defendant "at the trial." The court did not abuse its discretion or prejudice the defendant's rights, since the defendant's counsel was

present and agreed that they might be taken by the jury, even though they are not exhibits of the character contemplated by the statute. (*State* v. *Allen,* 23 Mont. 118, 57 Pac. 725.)

We have encountered difficulty in finding a basis for decision in this case, notwithstanding the numerous assignments of error made by the defendant. All of them appear to be without merit, including the subjects considered in this opinion. We are satisfied that no injustice was done the defendant upon the trial, and the judgment and orders are affirmed.

ASSOCIATE JUSTICES MATTHEWS, FORD and ANGSTMAN concur.

MR. CHIEF JUSTICE CALLAWAY, being absent, did not hear the argument and takes no part in the foregoing opinion.