Alfred **DALLAGO**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 22174.

United States Court of Appeals
District of Columbia Circuit.

Argued June 16, 1969.

Decided Nov. 7, 1969.

Mr. Jerome J. Londin, New York City, for appellant.

Mr. Arthur E. Matthews, Atty., United States Securities and Exchange Commission, with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and Paul H. Metzinger, Atty., United States Securities and Exchange Commission, were on the brief, for appellee.

Before McGOWAN, TAMM and ROBINSON, Circuit Judges.

**SPOTTSWOOD W. ROBINSON, III, Circuit Judge:**

After a trial by jury lasting six weeks, appellant was convicted on four counts of a five-count indictment charging conspiracy to violate and violations of provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.[1] He was sentenced to pay fines totaling $5,000. During the course of the trial, certain portions of files of the Securities and Exchange Commission were admitted in evidence pursuant to an agreement of counsel, acquiesced in by the court, that the unadmitted portions would be removed from the files before they were submitted to the jury. Unfortunately, the deletions were not made before the jury began its deliberations, and a file containing an unadmitted item found its way into the jury room. After careful consideration,[2] we cannot conclude on this record that appellant was not prejudiced by the error, and are compelled to reverse his conviction.[3]

**I**

**SUMMARY OF THE EVIDENCE** [4]

**A.** *The Government's Case*

The long chain of events leading to the indictment in this case began in 1958

---

1. 18 U.S.C. § 371, 15 U.S.C. §§ 77x, 78ff (1964). The charges, by individual counts of the indictment, are detailed in the summary of the Government's case, Part I, *infra.*

2. In the process, we settled on our ruling as to appellant's motion for leave to file a 64-page reply brief. The Government opposed the motion because of its length, see Fed.R.App.P. 28(g), and because appellant consumed but three of his 70 pages of opening brief in an effort directed exclusively toward a statement of the case, Fed.R.App.P. 28(a) (3), as compared with 33 pages devoted to that purpose in the reply brief. The latter, on the other hand, in part challenged the accuracy of factual statements in the Government's brief. With the motion maturing on the eve of oral argument, we deferred the ruling but indulged counsel on both sides in unrestricted reference during argument to any factual information of record.

We need not, even now, pursue the ramifications suggested by the parties' debate over justifications for the reply brief. The record is voluminous, the evidence is complex, and the assigned errors are fairly numerous. The Government itself filed a 71-page brief, and after the case was submitted we honored the Government's request that we disregard certain references in its brief to documents not placed in evidence. Much of the material in the reply brief to which the Government objects relates to issues we do not decide on this appeal, see note 3, *infra,* and the facts framing the one issue we do decide are not in real dispute.

All circumstances considered, and despite recognition of some merit in the Government's position but perceiving no harm it could suffer, we have resolved to grant appellant leave to file the reply brief, and we have given it due consideration.

3. There is, accordingly, no occasion for consideration of other questions which appellant has raised in some number on this appeal. See, however, notes 4 and 50, *infra,* and accompanying text. Many of those issues are unlikely to arise upon a retrial, and those that possibly could recur can be better and more safely dealt with in the context of the record then developed.

4. We outline here only so much of the evidence at trial as is essential to an understanding of the issue, and to an assessment of error and potential prejudice resulting from the submission to the jury of the item which was to have been deleted. We do not find that the evidence as a whole, absent the error, was insufficient to support the verdict. See note 50, *infra,* and accompanying text.

when appellant acquired all of the outstanding stock of Lancer Industries, Inc. (Lancer), a Florida corporation engaged principally in the manufacture and sale of boats, swimming pools, and other marine products and equipment. Appellant then sold shares in Lancer to Benjamin Tessler, who became president and a director of Lancer, and to Daniel J. Samuels, who served as vice president and director. Appellant became secretary-treasurer and a director of the company, and remained its principal shareholder. In September, 1958, 75,000 Lancer shares were sold to the public.

The Government contended that appellant dominated Lancer during the period relevant to the case, although he allegedly took a leave of absence because of illness during the first six months of 1961. In July of that year, appellant became chairman of Lancer's board of directors and served in that capacity until the fall of 1962. Tessler remained as president of Lancer until October, 1961, when he was replaced by Peter A. Cattano, Sr.

The Government's evidence tended to show that appellant, aided by Tessler and Cattano, organized or acquired three shell corporations which remained under appellant's control. These were Continental Swimming Pool Corporation (Continental), Flintridge Fiberglass and Electronics Corporation (Flintridge), and Lifetime Pools Equipment Corporation (Lifetime).

Continental was organized by appellant and Tessler in December, 1959, and dissolved less than a year later in October, 1960, after it had acquired the assets of a bankrupt North Carolina swimming pool corporation. These assets were shipped to a Lancer plant in Renovo, Pennsylvania. Flintridge was a California company acquired in the latter part of 1959 by another company controlled by appellant.[5] Its assets, consisting of a boat mold and some office fixtures, were delivered to a Lancer plant in North Hollywood, California, and Flintridge was dissolved in November, 1960.

Lifetime was organized in August, 1958, as a Lancer subsidiary. In December, 1958, all of the outstanding stock of Lifetime was sold to an employee of Lancer, one Cherch. The stock was repurchased one month later and transferred to Cattano in return for a promissory note. Cattano was president and a director of Lifetime from January, 1959, until 1961. The Government contended that neither of these purported transfers of control was a bona fide sale, and that it was appellant who made the business decisions for Lifetime. Lifetime was merged into Lancer in 1961.

The Government sought to prove that appellant caused his bookkeepers to prepare false invoices and record entries showing that Lancer made substantial sales of swimming pools and pool molds to the three controlled corporations. In order to clear the accounts receivable on Lancer's books resulting from these sales, Lancer recorded purchases of molds and other assets from the controlled corporations, including repurchases of pools originally sold to them by Lancer. Testimony of employees of the corporations involved tended to establish that none of them was assembling, selling or installing the substantial number of pools reflected as sales on Lancer's books, and little independent documentation of the recorded sales was produced by the defense. The first phase of the Government's case was thus an effort to demonstrate that appellant had engineered a series of sham intercompany transactions, whose effect was to substantially inflate Lancer's sales figures.

The second phase of the Government's case required proof of the treatment of these allegedly fictitious dealings in fil-

5. Flintridge was acquired by Senate Realty Corporation, a New York corporation of which appellant was president and controlling stockholder.

ings by Lancer with the Securities and Exchange Commission. During the years 1960 through 1962, when the sales were being recorded, appellant caused Lancer to acquire four other companies in exchange for Lancer stock.[6] The evidence showed that the parties to these transactions expected Lancer to file registration statements with the Securities and Exchange Commission to enable the former owners of the acquired companies to sell their Lancer shares.

A Lancer registration statement covering the public resale of the stock issued in the four acquisitions was filed with the Commission on April 28, 1961. This filing, signed by Tessler, did not contain the required financial data, and informed the Commission that a summary of earnings would be supplied by amendment. Two amendments and an annual report were subsequently filed. The registration statement, amendments, and the annual report contained the allegedly false statements, based on the previously recorded sales, which gave rise to the indictment.

Count one charged appellant with conspiring with other Lancer officials to violate the securities laws,[7] and on this count the jury returned a verdict of guilty. The substantive violations were charged in counts two through five. Count two charged that the registration statement filed on April 28, 1961, contained a false statement to the effect that Lancer had sold the stock in Lifetime, its wholly-owned subsidiary, to independent persons, and that the willful inclusion of this statement violated Section 24 of the Securities Act of 1933.[8] As we have seen, the Government contended that the sale first to Cherch and then to Cattano was a sham, and that appellant retained control of Lifetime. The jury, however, acquitted appellant on this count.

Counts three and four also charged violations of Section 24 in that an amendment filed September 15, 1961, and a post-effective amendment filed March 21, 1962,[9] each contained false statements regarding Lancer's sales and fixed assets at various times during 1960 and 1961. Count five charged that false statements concerning Lancer's sales and fixed assets as of February 28, 1961, were included in an annual report filed as required by Section 32(a) of the Securities Exchange Act of 1934.[10] The jury convict-

6. On April 26, 1960, Lancer acquired Missile Dynamics Corporation Air Products in exchange for 40,000 Lancer shares. On July 12, 1960, Lancer acquired Olympic Paint and Varnish Company in exchange for 12,000 Lancer shares. On December 30, 1960, Lancer acquired two companies, Federal Steel Products Corporation and Zenith Steel Casting Company, in exchange for 25,000 and 10,000 Lancer shares, respectively, plus cash payments.

7. 18 U.S.C. § 371 (1964). Tessler and Cattano were also indicted, along with J. Gilbert Brown, Lancer's auditor, and Albert M. Lewis, Lancer's comptroller and an officer and director of the company. Pretrial motions for severance were granted as to Tessler and Brown, and during the trial the court granted the Government's motions to dismiss the indictment as to Lewis and Cattano.

8. In relevant part, Section 24, 15 U.S.C. § 77x (1964), provides:
 * * * any person who willfully, in a registration statement filed under this subchapter, makes any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading, shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or both.

9. The post-effective amendment to Lancer's registration statement of April 28, 1961, was filed to increase the number of shares to be offered to the public pursuant to the statement. The filing appeared to be signed by appellant though, as stated in text, infra, he denied signing it. The registration statement, as supplemented by the first amendment, became effective on October 4, 1961, but none of the registered securities was sold pursuant to the statement because the filing was withdrawn in September, 1962.

10. Section 32(a), 15 U.S.C. § 78ff (1964), provides in relevant part:
 * * * any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to

ed appellant on each of these three counts.

## B. *The Defense*

The defense countered both steps of the Government's case. Appellant first asserted that the transactions between Lancer and the other companies were bona fide, and that his deceased brother, William Dallago, controlled Continental and Flintridge and made the purchases of pools for those companies from Lancer. Cross-examination of Government witnesses who testified to the general inactivity of the controlled companies succeeded at least in establishing the existence of pool molds which could have been sold, and in creating no little confusion as to the actual assets and operations of the companies alleged to be shells.

The remainder of the defense consisted of an effort to show that appellant did not personally undertake to assure that registration statements would be filed in connection with Lancer's four acquisitions in exchange for its stock, and that he took no part in the preparation and filing of the financial statements alleged to be false. Appellant testified that subsequent to the filing of the amendment on September 15, 1961, he had written to the attorney who prepared the filing and protested that it contained numerous errors, and had asked that the matters be discussed before the next amendment was filed. Although the post-effective amendment, filed March 21, 1962, appeared to have been signed by appellant, he denied that he had ever seen the filing. Appellant stated further that Tessler was responsible for providing the financial information and overseeing preparation of the filings.

## II

## ERROR IN SENDING EXHIBITS TO THE JURY

A great deal of documentary evidence was introduced at the trial, including portions of the substantial filings with the Securities and Exchange Commission by the companies with which appellant had been connected. When certain of the Commission's files were about to be placed in evidence, counsel for the Government and the defense, out of the jury's presence, informed the court of their stipulation that some of the Commission orders contained in the files would not be received in evidence. Defense counsel added that this understanding applied to all of the exhibits.

A few minutes later, the Government offered in evidence its Exhibit 49, a Commission file containing filings by Lifetime, one of the companies allegedly organized by appellant and Tessler. At the bench, the prosecutor stated that this exhibit contained an order suspending Lifetime's exemption from certain registration requirements of the Securities Act of 1933, and that at defense counsel's insistence it was to be removed. Both counsel then agreed that the order need not be extracted from the file unless the exhibit was requested by the jury.

On the first day of its deliberations, the jury sent to the court a note requesting a number of exhibits, which were delivered to them by the deputy clerk. In assembling the exhibits requested, the deputy clerk saw that the jury had apparently asked for an item not in evidence. and informed the court of this. The court then called in counsel to check the request whereupon, it seems, counsel first learned that exhibits were being sent for by the jury.

After the conference, counsel checked the exhibits requested in a second note from the jury. At the end of the first day's deliberations, defense counsel saw that a group of exhibits, which apparently had been brought back from the jury room, included four bulky Commission files which had not been requested in the jury's first or second notes. One of these was Government's Exhibit 49,

be filed under this chapter * * * which statement was false or misleading with respect to any material fact,

shall upon conviction be fined not more than $10,000, or imprisoned not more than two years, or both * * *.

which still contained the suspension order.

How the exhibits not requested got into the jury room is something of a mystery. The deputy clerk and the marshals all denied that they had delivered those exhibits to the jury. Because the court initially entertained what we view as a reasonable doubt that the exhibits were actually sent to the jury, inquiry was made of the foreman, whose recollection was unclear. The secretary of the jury [11] was then questioned, and she stated positively that she had looked at the unrequested exhibits in the jury room.

So it is that we encounter the problem arising from transmittal of the unexpurgated exhibit, but that is not all. A comparable problem, assigned as additional error, emanates from a similar mishap in regard to the indictment upon which appellant was being tried. Paragraph 17 of count one of the indictment—the conspiracy count—alleged a scheme to defraud through false statements and misleading omissions incidental to a public offering of Lancer stock,[12] but the Gov-

ernment offered no proof to substantiate the charge. The court sustained appellant's objection to submission of paragraph 17 to the jury, and it was to have been stricken from the indictment. However, it was not physically deleted, and on the first day of the jury's deliberations the indictment was sent to the jury room. When the judge learned of the error, he called the jurors back into the courtroom and instructed them to disregard paragraph 17, explaining that no evidence had been introduced to support it. A retyped copy of the indictment, omitting paragraph 17, was then given to the jury, and its deliberations were permitted to resume. Irrespective of one's view as to whether these events, independently or conjunctively with others, give cause for reversal,[13] they reflect upon the delivery of the exhibits to the jury in a manner which we are not free to ignore.

Appellant takes the position, as we understand it, that a transmittal of the exhibits or the indictment to the jury at a time when neither the accused nor

11. This juror appears to have derived her title from an assignment, by the body of jurors, of the task of handling the documentary evidence and keeping notes on the deliberations.

12. Paragraph 17 alleged that "[i]t was a further part of the conspiracy that the defendants intended to and would by use of the mails and means and instruments of communication in interstate commerce in the offer and sales of securities, namely, 50,000 shares of common stock of Lancer, unlawfully, willfully and knowingly, directly and indirectly, employ a device, scheme and artifice to defraud and obtain money and property by untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and would engage in transactions, practices and a course of business which would operate as a fraud and deceit upon the purchasers of the securities."

13. Our conclusion that transmittal of the unadmitted Lifetime suspension order was of itself reversible error removes any need to consider whether the court's

special instructions, coupled with those in the original charge, neutralized the error. See, however, Blauner v. United States, 293 F.2d 723, 736–737 (8th Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

Of course, curative instructions are no panacea, see the cases cited *infra* note 38, but our jurisprudential system assumes, at least to some extent, that juries are able to grasp the fundamental distinction between allegations in an indictment and evidence pointing toward guilt. Whenever counts are stricken or offenses reduced in the course of a trial, the jury is aware that the accused was originally charged in the indictment with other or greater offenses, yet we do not fret over their capacity to decide the case on the evidence before them. It may be that the jurors' knowledge that the accused was charged with acts or offenses not proven in the trial before them is significantly less prejudicial than inferences that may be drawn from evidence that the accused has committed other crimes on other occasions, see United States v. Douglas, 155 F.2d 894, 895–896 (7th Cir. 1946), and thus more susceptible to cure by an appropriate instruction.

his counsel is present violates rights secured not only by Rule 43 of the Federal Rules of Criminal Procedure [14] but by the Sixth Amendment as well, and that the problem we consider is accordingly of constitutional dimensions. We disagree with so broad a contention on both of its points. The jurors, at some time prior to verdict, are entitled to examine the documents admitted in evidence, and their examination in the jury room during deliberations is a matter within the sound discretion of the trial court.[15] The jurors must likewise be informed about the charges on which the accused is being tried in a degree sufficient to enable intelligent consideration in the light of the evidence, and whether to permit the jury to have the indictment during deliberations is another decision committed to the court's discretion.[16] Counsel should, of course, be apprised of the court's intention to give the indictment to the jury so that timely objections and requests for appropriate instructions may be made.[17] And where, as in the case at bar, portions of documentary evidence or of the indictment are to be shielded from the jury's view, defense counsel is entitled, prior to the jury's inspection, to the opportunity, by personal presence at the excising or otherwise, to make certain that deletions essential to that end have been accomplished.[18] But this is a far cry from saying that the accused and his counsel must be present when nothing remains to be done except to transmit items fully in evidence or an unobjectionable indictment upon a request from the jury.[19] Certainly if counsel desires to oversee the mechanical operation of transmittal, his wishes should be heeded, but we do not consider so ministerial an activity a "stage of the trial" within Rule 43,[20] or a "critical" [21] step in the proceedings "where counsel's absence might derogate from the accused's right to a fair trial" [22]

■ Nonetheless, it is perfectly plain that the jury room must be kept free of evidence not received during trial, and that its presence, if prejudicial, will vitiate the verdict.[23] Ranking high among

14. "The defendant shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules." Fed.R.Crim.P. 43.

15. Robinson v. United States, 93 U.S.App. D.C. 347, 350, 210 F.2d 29, 32 (1954); Buckner v. United States, 81 U.S.App. D.C. 38, 39, 154 F.2d 317, 318 (1946).

16. See, *e. g.*, Bruce v. United States, 351 F.2d 318, 320 (5th Cir. 1965), cert. denied, 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed. 2d 441 (1966); Shayne v. United States, 255 F.2d 739, 743 (9th Cir.), cert. denied, 358 U.S. 823, 79 S.Ct. 39, 3 L.Ed.2d 64 (1958); Wall v. United States, 384 F.2d 758, 763 (10th Cir. 1967).

17. See Whittlesey v. United States, 221 A.2d 86, 91 (D.C.App.1966).

18. Compare Bates v. Preble, 151 U.S. 149, 157–158, 14 S.Ct. 277, 38 L.Ed. 106 (1894).

19. Compare Downing v. United States, 348 F.2d 594, 601 (5th Cir.), cert. denied, 382 U.S. 901, 86 S.Ct. 235, 15 L. Ed.2d 155 (1965).

20. See United States v. Blackney, 155 F. Supp. 712 (D.D.C.1957), aff'd 103 U.S. App.D.C. 187, 257 F.2d 191, cert. denied, 358 U.S. 850, 79 S.Ct. 77, 3 L.Ed.2d 84 (1958); compare Goodall v. United States, 86 U.S.App.D.C. 148, 153, 180 F.2d 397, 402, 17 A.L.R.2d 1070, cert. denied, 339 U.S. 987, 70 S.Ct. 1009, 94 L.Ed. 1389 (1950).; State v. Olson, 87 Mont. 389, 287 P. 938, 940 (1930). But see Holland v. United States, 348 U.S. 121, 127–128, 75 S.Ct. 127, 99 L.Ed. 150 (1954).

21. This is the word familiarly employed to characterize stages of the prosecution where representation by counsel is essential to assure a fair trial and a meaningful defense. *E. g.*, United States v. Wade, 388 U.S. 218, 225–227, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

22. *Id.* at 226, 87 S.Ct. at 1932. And in McGill v. United States, 121 U.S.App. D.C. 179, 181, 348 F.2d 791, 793 (1965), we saw "no basis for concluding that the Constitution requires the presence or assignment of counsel at a point when and where there is no reasonable possibility of prejudice to the rights or position of an accused, * * *."

23. Sawyer v. United States, 112 U.S.App. D.C. 381, 384, 303 F.2d 392, 395, cert.

contaminants that might easily have that effect are extrajudicial facts associating the accused with criminality not involved in the trial,[24] and the Lifetime suspension order, as will appear, had such elements.[25] It matters not that the foreign matter invades the jury's sanctuary in consequence of mistake or accident so long as the accused is not at fault,[26] and the record does not gainsay appellant's vigorous assertion that here he was not.[27]

The methodology for transmission of exhibits to the jury during its deliberations is a matter well within the court's administrative authority over the trial.[28] It may be that in some cases the court will find it simpler to supervise and direct the delivery of exhibits personally, but the process, at the court's choice is fully delegable.[29] Particularly in a case with extensive documentary evidence such as this, the court enjoys considerable flexibility in the allocation of responsibility for checking exhibits,[30] and may impose that responsibility upon the clerk or upon counsel.[31] Certainly the prosecutor may reasonably be assigned the burden of culling material that is not in

evidence from Government files that otherwise are.[32] Such an arrangement, in turn, would obligate defense counsel to make his objections to unculled prejudicial or extraneous matter in Government exhibits clearly and timely known.[33]

It seems clear that the failure to remove the Lifetime suspension order from Government's Exhibit 49 resulted from misunderstanding as to what the procedure would be. In its charge, the court reminded the jurors that both Government and defense counsel had told them in closing arguments that any exhibits desired would be sent to them upon the written request of their foreman, but the record discloses no discussion of the mechanics of complying with such requests. The court evidently, and if so understandably, relied on the deputy clerk to supervise transmission of the exhibits to the jury, doubtless expecting counsel to see to it that items not in evidence would be expunged before delivery. On the other hand, so far as appears, counsel were not instructed to screen the exhibits,[34] and evidently did not do so be-

denied, 371 U.S. 879, 83 S.Ct. 150, 9 L.Ed.2d 116 (1962); United States v. Brandenburg, 155 F.2d 110, 113 (3d Cir. 1946), cert. denied, 332 U.S. 769, 68 S.Ct. 80, 92 L.Ed. 354 (1947); United States v. Michener, 152 F.2d 880, 886 (3d Cir. 1945); Ogden v. United States, 112 F. 523, 526 (3d Cir. 1902); United States v. Grady, 185 F.2d 273, 274 (7th Cir. 1950); United States v. Douglas, *supra* note 13; Osborne v. United States, 351 F.2d 111, 115 (8th Cir. 1965).

24. See the cases cited *supra* note 23. Compare, e. g., Reichert v. United States, 123 U.S.App.D.C. 294, 296–298, 359 F.2d 278, 280–282 (1966); McFarland v. United States, 80 U.S.App.D.C. 196, 197, 150 F.2d 593, 594, cert. denied, 326 U.S. 788, 66 S.Ct. 472, 90 L.Ed. 478 (1946). See also the cases cited in note 55, *infra*.

25. See Part III, *infra*, particularly at note 37.

26. See Osborne v. United States, *supra* note 23, 351 F.2d at 116. See also the cases cited *supra* note 23.

27. See text *infra* at notes 34–35.

28. Osborne v. United States, *supra* note 23, 351 F.2d at 116.

29. *Id.*

30. *Id.*

31. *Id.*

32. See United States v. Douglas, *supra* note 13, 155 F.2d at 896.

33. At the hearing following discovery of the mistaken delivery of the exhibits, defense counsel stated that he had intended to have had deleted certain references to a number of lawsuits against Lancer which were ultimately dismissed. These references appear in Government's Exhibit 50, another unrequested document sent to the jury. The record does not show that Government counsel was ever informed of specific deletions desired by the defense except the Lifetime suspension order.

34. Compare Osborne v. United States, *supra* note 23, 351 F.2d at 115, 116. There the court rejected the Government's argument that defense counsel

forehand because they expected to be notified of the jury's calls. Manifestly, the court and counsel did not know that exhibits were being sent to the jury, and consequently were not alerted to the urgent need for action.[35] And it is self-evident that the real source of the trouble was the inexplicable something that caused the exhibit in question to wind up in the jury room without any request by the jury for it.

 Whatever the cause and wherever the blame for this unfortunate episode, which the record does not precisely identify, both authority and reason dictate its legal effect. There was error in the delivery to the jury of the unadmitted Lifetime suspension order as part of Government's Exhibit 49, and this we are compelled to hold.[36] There remains for further consideration only the question whether the error was so potentially detrimental to appellant as to necessitate a new trial.

### III

### THE LIFETIME SUSPENSION ORDER

The suspension order, date October 31, 1961, stated that the Commission had reasonable cause to believe that Lifetime had failed to disclose an underwriter in its notification and offering circular, filed June 1, 1959, relating to a proposed public offering of its stock. In addition, the order continued, the undisclosed corporate underwriter was ineligible to act in that capacity because it had acted as underwriter in the offering of another company, whose exemption was suspended. The order summarized these omissions in statutory language alleging that "[t]he offering circular contains untrue statements of material fact and omits to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. * * * " The order also specified that Lifetime's "report of sales on Form 2–A was misleading * * *," particularly with respect to the failure to disclose the underwriter. The concluding paragraph stated that the offering was made in violation of Section 17(a) of the Securities Act of 1933,[37] which contains the general prohibition against fraudulent interstate transactions.

The Government advances several arguments in support of its position that the error in sending the suspension order to the jury was harmless: (1) that it is unlikely that members of the jury read the order; (2) that the acquittal of appellant on count two, charging a failure to disclose Lancer's affiliation with Lifetime, shows that the jury disassociated appellant from Lifetime's operations; (3) that any negative inference to be drawn from the suspension order was neutralized by certain testimony given at the trial; and (4) that the error was not prejudicial because the evidence of appellant's guilt was overwhelming.[38] These

---

had a duty, on pain of waiver of any error, to screen exhibits for objectionable matter, invalidating any intimation to the contrary derivable from its earlier decision in Finnegan v. United States, 204 F.2d 105, 115–116 (8th Cir.), cert. denied, 346 U.S. 821, 74 S.Ct. 36, 98 L. Ed. 347 (1953).

35. Compare United States v. Grady, *supra* note 23, 185 F.2d at 274; United States v. Douglas, *supra* note 13, 155 F.2d at 896; Osborne v. United States, *supra* note 23, 351 F.2d at 116. By the same token, defense counsel cannot, in these circumstances, be held to have waived the objection. United States v. Douglas *supra*; Osborne v. United States, *supra*.

See also note 34, *supra*. We may distinguish cases wherein counsel knew that an exhibit embracing unadmitted matter was being transmitted to the jury. *E. g.,* United States v. Strassman, 241 F.2d 784, 786 (2d Cir. 1957); Finnegan v. United States, *supra* note 34, 204 F.2d at 115–116.

36. See the cases cited *supra* note 23.

37. 15 U.S.C. § 77q (1964).

38. The Government also argues that appellant should have requested a curative instruction upon discovery of the erroneous delivery of the suspension order to the jury. No case has come to our attention

arguments, which we successively address, do not, even combinationally, persuade us that the error was harmless.

## A. *The Likelihood of Juror Examination*

The suspension order remained in the jury room for not more than three hours of the jury's five-day deliberations. It constituted the last two pages of an 87 page exhibit, and the jury had other lengthy exhibits before it at the same time. Still, our only clue to what actually went on in the jury room is provided by the testimony of the foreman and the secretary, who were questioned by the court about the documents sent to the jury. The foreman said that he and the secretary had looked through the exhibits. The secretary testified positively that the exhibits in question were received, and remarked that the exhibits were not checked off the list when received because "[e]veryone was eager to read, and they were sort of divided up * * * and then we began to look for things we had not found. * * *" She added that she herself had read one of the unrequest-

ed exhibits, not the Lifetime file, "with interest and care in spots."

These circumstances, in our view, bespeak the real possibility that one or more of the jurors read the suspension order. The more vital consideration, however, is that, with its presence in the jury room incontrovertibly appearing, we could not prudently presume that it was not read. A cardinal rule of our jurisprudence is that the sanctity of the jury room must remain inviolate. The right to trial by jury becomes the more fragile as leeway for an improperly influenced verdict is permitted to widen. Courts have oftimes declined to speculate that harmful matter in the jury room was not seen by the jurors,[39] and we ourselves have had occasion to turn down such an invitation. In Leigh v. United States,[40] where the accused's handwriting exemplar was admitted into evidence without excision of a listing of prior arrests contained therein, we reversed his conviction despite the Government's protest that there was no showing that the jury actually saw the document. Though we found that "[o]n this point the record is not clear,"[41] we

in which a court has held that a sojourn of harmful material in the jury room can be so readily repaired and, contrarily, it has been held that instructions are ineffective for the purpose. See United States v. Grady, *supra* note 23, 185 F.2d at 274. The efficacy of a curative instruction is suspect when, even in the scrutiny of the courtroom, inadmissible incriminating material comes before the jury, see, e. g., Bruton v. United States, 391 U.S. 123, 128–137, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) ; Gregory v. United States, 125 U.S.App.D.C. 140, 144–145, 369 F.2d 185, 189–190 (1966), and we think that such an instruction might well have done more harm than good in this case. Although the prejudicial overtones of the suspension order conceivably might have been dispelled by an explanation, the price would have been a sharp focus by the jury on the problem, however it was to be approached. A determination as to whether any juror had actually read the order would have necessitated a broader interrogation than had already occurred. An instruction without such a determination would have accentuated the prejudice if one or more jurors had examined the order and, if none had, would have need-

lessly brought it to the attention of all of the jurors.

In these circumstances, the court properly rejected the Government's suggestion that the jury be instructed to disregard the suspension order. And we decline its further suggestion that appellant should have asked for such an instruction for, atop the foregoing reasons, as the Supreme Court said in disposing of the same contention in a similar context, "[p]lainly, the defense was under no obligation to take such a risk." Stewart v. United States, 366 U.S. 1, 10, 81 S.Ct. 941, 946, 6 L.Ed.2d 84 (1961).

39. United States v. Brandenburg, *supra* note 23, 155 F.2d at 113; United States v. Michener, *supra* note 23, 152 F.2d at 886; Ogden v. United States, *supra* note 23, 112 F. at 526–527; United States v. Grady, *supra* note 23, 185 F.2d at 275. See also Stewart v. United States, *supra* note 38, 366 U.S. at 7, 81 S.Ct. 941; Osborne v. United States, *supra* note 23, 351 F.2d at 118.

40. 113 U.S.App.D.C. 390, 308 F.2d 345 (1962).

41. *Id.* at 391, 308 F.2d at 346.

declared unqualifiedly that "we cannot assume that it was not seen by the jury." [42] And here, absent convincing proof that somehow the suspension order escaped the jury's attention,[43] we have no firmer ground on which to base a different conclusion.

## B. *The Acquittal on Count Two*

■ The jury's acquittal of appellant on count two, charging a failure to disclose the alleged affiliation between Lancer and Lifetime, does not satisfy us that the jury did not consider appellant responsible for Lifetime's operations. The registration statement containing this allegedly fraudulent concealment, unlike the amendments on account of which appellant was convicted, was filed during a period when, according to appellant, he had suspended his official activities with Lancer because of illness. The Government, on the other hand, contended that appellant was then still active in Lancer's affairs on a consultation basis. It is highly probable that the jury was simply not convinced that appellant participated in the filing of the registration statement during his period of illness and acquitted him for that reason, and not because it believed that Lifetime was operating outside the sphere of appellant's influence.

This view finds additional support in the fact that the prosecutor stressed in his argument to the jury that the allegedly sham Lancer-Lifetime transactions amounted to more than half of Lancer's reported sales for the second year in question. In light of this fact, there may be doubt as to whether the jury would have convicted appellant on the three counts based on inflated sales figures included in the amendments to the registration statement if they did not believe that he exercised control over Lifetime when the intercompany sales were recorded. In sum, we think the verdict shows that the prosecutor succeeded in establishing appellant's de facto control of Lifetime, and that the jury might well have connected with him the alleged violations of law by Lifetime.

42. *Id.*

43. In Ogden v. United States, *supra* note 23, the jurors, on a retrial, as they retired to commence deliberations, were given the two indictments upon which the defendant was being retried, and these they took into the jury room. Indorsed on the back of each indictment was the verdict of guilty returned on that indictment on the first trial. In reversing the convictions on the retrial, the court said:

It is, however, contended by the counsel for the defendant in error that it is not shown by the depositions taken that the indorsements on the indictments were read by any of the jurors. The fact that papers with such indorsements upon them were handed to the foreman of the jury, presumably by authority, along with other papers, by an officer of the court, could hardly fail to give to the jury the impression that they were intended for their consideration, and that they were expected to have some weight in forming their verdict. We do not think it was necessary on the part of the defendant below to show that such indorsements had been read by the jurors or any of them. It was a gross violation of the rights of the defendant below that they should have been handed to them at all in the manner in which they were. Trial by jury is properly surrounded by every reasonable safeguard, to insure the absence of any improper influence that might operate upon the minds of the jurors, and give to their verdict the dignity and respect so important to be maintained in the interests of an impartial administration of justice. It was not necessary, therefore, in our opinion, that the defendant below should have gone further than he did, when he showed the presence in the jury room of the indictments with the obnoxious indorsements, and the circumstances under which they came into the possession of the jury. Whether proof that these indorsements were not read by any of the jury would have brought us to a different conclusion need not now be considered. If it would have had such an effect, the burden was upon the defendant in error to produce the proof. The presumption that their presence in the jury room, under the circumstances, was injurious to the defendant below, remains until rebutted by evidence on the part of the plaintiff below. 112 F. at 526–527.

### C. *The "Trouble in Pittsburgh"*

■ The Government urges, and we do not disagree, that the details of Lifetime's suspension were somewhat removed from the offenses charged against appellant by the indictment. At the trial, the only testimony touching on Lifetime's trouble with the public sale of its stock was given by Commission accountant Hodges during defense counsel's cross-examination regarding the time when Lifetime would have received the proceeds of sale.[44] Asked if any of the stock had been sold before the effective date, the witness said he did not know, but thought that Lifetime had encountered some difficulty with one offering. The court then asked the witness what his understanding was, and the witness replied that "Lifetime had had some trouble with one of its offerings to a Pittsburgh dealer." Appellant's counsel then asked whether the difficulty had involved any of the defendants on trial. Hodges replied, "No, not them personally," and this was the end of it.

The Government contends that Hodges' cryptic reference to trouble in Pittsburgh not involving the defendants would have negated any prejudicial inference the jurors might have drawn if any read the Lifetime suspension order. We think it highly unlikely, however, that the jury would have made any connection between "trouble in Pittsburgh," not mentioned in the order, and the reasons for issuance of the suspension order, even if they recalled Hodges' brief comment made almost a month earlier. Nothing said at the trial would have explained to a juror examining the suspension order what Lifetime's failure to disclose an underwriter really meant. The only distinct impression emerging from the order is that one of appellant's companies was in trouble for filing "untrue statements" with the Commission, and that one of those statements involved "sales." We would be hard pressed to dismiss the resulting possibility of prejudice—that was clear enough to defense counsel and the prosecutor when they agreed to keep the suspension order out of evidence.

### D. *The Strength of the Government's Case*

■ The Government falls back on our decision in Sawyer v. United States,[45] where we held that a similar error, in sending a witness' prejudicial statement not in evidence to the jury, did not require reversal because the proof of guilt was "overwhelming."[46] Certainly the weight of the prosecution's evidence becomes relevant in estimating "what effect the error had or reasonably may be taken to have had upon the jury's decision."[47] Our judgment "must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened."[48] When we look to the record before us, we find that indeed a great deal happened in this case.

In quantity, at least, the evidence approached the overwhelming[49] and, as the prosecutor told the jury in his opening and closing statements, a great many

---

44. The Government had previously attempted to show, through Hodges' testimony, that most of the money raised in this public offering was immediately paid to Lancer by Lifetime for swimming pools. The court did not permit Hodges to draw the inference that the money was so paid from contemporaneous entries on the books of the two companies. The Government did not touch on the point in its argument to the jury.

45. *Supra* note 23.

46. 112 U.S.App.D.C. at 384, 303 F.2d at 395.

47. Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946). See also Sawyer v. United States, *supra* note 23, 112 U.S.App.D.C. at 384, 303 F.2d at 395; Osborne v. United States, *supra* note 23, 351 F.2d at 118.

48. Kotteakos v. United States, *supra* note 47, 328 U.S. at 764, 66 S.Ct. at 1248.

49. The Government presented 150 exhibits and called 25 witnesses. Appellant produced 25 exhibits and called 12 witnesses. The trial, as we have stated, endured six weeks.

pieces had to be put together to solve the puzzle. The Government's unenviable task was to establish a negative net worth case—to show beyond a reasonable doubt that recorded sales which might have been made were not made in fact. It had to prove that appellant, who was not officially the principal executive of Lancer and the controlled companies, actually masterminded the scheme to inflate Lancer's sales, and that he was responsible for the false statements in the filings with the Commission even though Tessler and Cattano compiled the information and signed all but one of the filings on account of which appellant was convicted.

We do not find that the theory of the prosecution was insupportable in law, or that the evidence could not support a conviction.[50] It is clear, however, that the jury had to consider an unusually complicated set of facts, and had to find appellant guilty, if at all, on the basis of inferences permitted but not compelled by circumstantial evidence.[51] The conviction necessarily rests to a substantial degree on the jury's assessment of the credibility of the opposing Government and defense witnesses, including appel-

lant, and we cannot say that the contest was one-sided on that score. The jury deliberated for five days, and one would expect that if the evidence of guilt was overwhelming the jury would have succumbed much sooner.[52]

Our judgments that the suspension order contained prejudicial references to violations of law and that the evidence was not overwhelming do not conclude the matter. We recognize that the decisions resulting in reversal of convictions have usually involved the erroneous submission to the jury of statements not in evidence that were highly prejudicial in character.[53] The authorities cited by the Government suggest, moreover, that material more sensational than that in the Lifetime suspension order need not compel reversal where it is merely cumulative of other strong evidence.[54] Still, while the content of the suspension order hardly strikes us as inflammatory, the allegations of illegality in the order were plainly not cumulative to evidence relating to any of the offenses charged. Nor can the statements in the order be fairly described otherwise than as evidence of illegal activity by a company allegedly

---

50. Compare Danser v. United States, 281 F.2d 492 (1st Cir. 1960).

51. The accuracy of this description is confirmed by the Government's brief, which stresses two letters apparently signed by appellant to show his knowledge of the illegal activity for which he was charged. Neither letter was admitted in evidence. This mistake is doubtless due to changes in Government counsel over this long proceeding, and some confusion in the record as to which exhibits were admitted. In any event, the Government produced little documentary evidence sufficient on its face to show that appellant was responsible for Lancer's fraudulent undertakings.

52. See Osborne v. United States, *supra* note 23, 351 F.2d at 118.

53. United States v. Brandenburg, *supra* note 23 (Government agents' notes on investigation of narcotic law violations erroneously left attached to documents properly received in evidence) ; Ogden v.

United States, *supra* note 23, discussed *supra* note 43; United States v. Grady, *supra* note 23 (affidavit attached to information stating that the allegations of the information were true) ; United States v. Douglas, *supra* note 13 (affidavits attached to information summarizing the proof essential to a conviction) ; Osborne v. United States, *supra* note 23 (grand jury transcript of witness' testimony, not in evidence, implicating accused in offense on trial and in another offense, and alleging statements by accused derogatory of his character and indicating guilt of other crimes).

54. See Sawyer v. United States, *supra* note 23, 112 U.S.App.D.C. at 384, 303 F.2d at 395; United States v. Strassman, *supra* note 35, 241 F.2d at 785–786; Finnegan v. United States, *supra* note 34, 204 F.2d at 115–116. On the other hand, the prejudice from the suspension order given the jury in this case seriously reflected on appellant's credibility and necessarily affected all counts.

controlled by appellant and deeply involved in the offenses charged. Traditional restrictions on the prosecution's resort to evidence of that type solidly attest its inherent prejudicial propensities.[55]

In his argument to the jury, the prosecutor accurately summed up the litigation with the observations that "what this case is about in the final analysis is lying. What this case is about is fraud and misrepresentation and deceit. What this case is about is dishonesty in the business community." In a trial for filing false statements, where appellant's honesty as a businessman and his credibility as a witness were the central issues, any hint to the jury that he might have been responsible for other false filings could have weighted the scale in the Government's favor. Had the suspension order in question named appellant personally as a participant in such unworthy conduct, its vitiating effect would not be open to responsible argument.[56] We conclude, under the circumstances, including importantly the state of the evidence tying appellant to Lifetime's operations, that the suspension order was well calculated to reflect upon him in much the same way.

In such wise, our duty as judges becomes clear. Though the trial was long and well conducted, serious error crept in, albeit quite accidentally, at nearly the very end. That error, by our estimate, is of such magnitude and consequence as to mandate the award of a new trial. For

if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.[57]

And as Judge Friendly of the Second Circuit has aptly put it "[t]he principle that the jury may consider only matter that has been received in evidence is so fundamental that a breach of it should not be condoned if there is the slightest possibility that harm could have resulted."[58] We deem the possibility of harm in this case to be more than slight, so much so as to engender our skepticism that the mistaken delivery of the suspension order to the jury did not enable it to assume an impermissible role in the jury's determination of guilt.

The judgment of appellant's conviction is accordingly reversed, and the case is remanded to the District Court for a new trial.

So ordered.

55. Compare Osborne v. United States, *supra* note 23, 251 F.2d at 117. See also note 24, *supra*, and accompanying text. This court has been especially wary of the prejudicial effect of evidence of other illegal conduct by the accused. See, e. g., Barnes v. United States, 124 U.S.App. D.C. 318, 365 F.2d 509 (1966); Pinkney v. United States, 124 U.S.App.D.C. 209, 363 F.2d 696 (1966); Luck v. United States, 121 U.S.App.D.C. 151, 155–157, 348 F.2d 763, 767–769 (1965).

56. Abrams v. United States, 117 U.S.App. D.C. 200, 327 F.2d 898 (1964).

57. Kotteakos v. United States, *supra* note 47, 328 U.S. at 765, 66 S.Ct. at 1248. See also Leigh v. United States, *supra* note 40, 113 U.S.App.D.C. at 391, 308 F.2d at 346; Osborne v. United States, *supra* note 23, 351 F.2d at 117.

58. United States v. Adams, 385 F.2d 548, 550–551 (2d Cir. 1967).