**UNITED STATES of America**

v.

**Mary TREADWELL, a/k/a Mary T. Barry, a/k/a Mary T. Williams, Appellant.**

**No. 84–5425.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1985.

Decided April 30, 1985.

John W. Nields, Jr., Washington, D.C. (appointed by this court), with whom Sara E. Johnson was on the brief, for appellant. Robert G. Joseph, Washington, D.C., also entered an appearance for appellant.

Helen M. Bollwerk, Asst. U.S. Atty., Washington, D.C., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, William D. Pease, Stephen R. Spivack, and Melanie G. Dorsey, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before TAMM and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In 1982, the grand jury for the District of Columbia indicted appellant Mary Treadwell, Robert E. Lee, Joan M. Booth, Charles W. Rinker, Jr., and Ronald S. Williams on one count of conspiracy, 18 U.S.C. § 371 (1982), sixteen counts of making false statements, 18 U.S.C. § 1001 (1982), seven counts of mail fraud, 18 U.S.C. § 1341 (1982), and one count of wire fraud, 18 U.S.C. § 1343 (1982). Appellant was also charged with three counts of income tax evasion, 26 U.S.C. § 7201 (1982).[1]

On July 29, 1983, a jury found Treadwell guilty of one count of conspiracy and seven counts of making false statements and acquitted her of three counts of tax evasion, one count of wire fraud, and nine counts of making false statements. United States District Judge John G. Penn denied her subsequent motions for a judgment of acquittal and a new trial. 594 F.Supp. 831. The court sentenced Treadwell to three years' imprisonment and imposed a fine of $40,000.

Treadwell appeals, claiming, *inter alia,* that the trial court erred by: (1) denying her motion for acquittal on the conspiracy count because the evidence was insufficient; (2) delivering misleading and prejudicial jury instructions regarding the object of the conspiracy and the use of co-conspirator statements; and (3) denying her motion for a new trial because a document not in evidence was sent to the jury room. For the reasons given below, we affirm the conviction.

## I. BACKGROUND

### A. *The Government's Case*

Appellant in the mid-1970s was the chief executive officer of P.I. Properties ("P.I."), a nonprofit real estate ownership and management firm. Co-conspirators Robert Lee and Joan Booth, Treadwell's sister, served on P.I.'s Board of Directors and were employed as project managers. Co-conspirator Ronald Williams, appellant's fiance, and later, husband, at one time was engaged by P.I. to perform accounting services. The government claimed that the conspirators used P.I. to acquire control of Clifton Terrace, a government-sponsored housing project, to misuse the project's assets for the enrichment of themselves and their other businesses, and to conceal these activities from government authorities.

Clifton Terrace is a low-income housing project in northwest Washington, D.C., presently owned by the United States Department of Housing and Urban Development ("HUD" or "the Department"). It has always suffered from a variety of problems typical of such projects—high crime, low tenant morale, and rental receipts inadequate to cover project expenses. Trial Transcript (Tr.) 2053–56, 2074–76. Hoping to revitalize the project, the Department in the spring of 1974 agreed to sell Clifton Terrace to P.I. Properties. Tr. 1961–63, 2133–35. After passage of title, however, the property remained subject to a forty-year, HUD-held mortgage and a regulatory agreement providing the Department with a measure of control during the mortgage period. The agreement required the project to submit monthly financial reports and annual audited financial statements and prohibited it from taking certain actions, including the collateralization of rents and tenant security deposits, without Department approval. Gov. Exh. 624.

Treadwell did not supervise the daily operations of P.I. or Clifton Terrace but instead delegated those responsibilities to Robert Lee. He supervised an on-site staff consisting principally of Joan Booth and Zellene Laney, the bookkeeper. Treadwell exercised general supervisory authority and provided specific instructions regarding the project by holding regular meetings with Lee and Booth. Tr. 2403–04. Tread-

---

1. Lee and Booth pleaded guilty to the conspiracy charge. Williams pleaded guilty to one count of making false statements. The charges against Rinker were dismissed prior to the trial, as were six of the seven mail fraud counts against Treadwell. The court granted appellant's motion for acquittal on the remaining mail fraud count following presentation of the government's case.

well did not personally manage Clifton Terrace because, in addition to P.I., she was the chief executive officer of four other corporations: Youth Pride, Inc. ("Pride"), Pride Economic Enterprises ("PEE"), Pride Environmental Services ("PES"), and T. Barry Associates ("T. Barry"), the last three for-profit organizations.[2]

Treadwell's other businesses enjoyed substantial benefits as a result of P.I.'s acquisition of Clifton Terrace.[3] PEE benefitted the most conspicuously. In November 1974, P.I. began providing management services to the PEE-owned Buena Vista apartments, using the Clifton Terrace office staff, supplies, and facilities to do so. Clifton Terrace paid P.I. a monthly management fee of seven percent of gross income as compensation for its services. Buena Vista, however, paid no fee because

PEE, its owner, was $200,000 in debt and could not afford it. Tr. 2432–35. Instead, PEE's directors, appellant among them, passed a resolution to compensate P.I. by a transfer of PEE stock. Tr. 2964–65. In effect, however, Clifton Terrace directly subsidized Buena Vista's management costs.[4]

In April 1975, appellant and Lee created a new PEE division, the Special Police, in order to obtain a contract to provide security services for Clifton Terrace.[5] Fees paid to the Special Police from Clifton Terrace funds were a substantial source of revenue for the conspirators and their businesses.[6] Tr. 2661–76, 3262. In addition to their Clifton Terrace duties, the Special Police were regularly used to perform personal services for the conspirators [7] and to provide security services at Buena Vista and Kenesaw.[8]

2. Pride was a job training and black self-help organization, and PEE operated several businesses that hired Pride trainees. PES made litter containers for the city and sold advertising space on them. T. Barry was a public relations firm and advertising agency that obtained accounts for PES. In 1976, Treadwell and Lee set up Sticks and Stones, Inc., a for-profit housing rehabilitation business.

3. P.I.'s application to the Internal Revenue Service requesting tax-exempt status represented that P.I.'s activities would be wholly unrelated to PEE and the other Pride-affiliated companies. Trial Transcript (Tr.) 2958–69, 2992–93. P.I.'s annual informational returns filed in subsequent years continued to misrepresent the nature and extent of the relationships among these companies. Tr. 4083–89.

4. In 1976, P.I. also assumed management responsibilities for the Kenesaw Apartments, a complex owned by Antioch Law School. Although Kenesaw paid a management fee to P.I., it too relied on Clifton Terrace staff and resources to provide its daily management services. Tr. 2436–38.

5. HUD's award of the security contract to PEE was highly irregular. PEE was not a contractor on HUD's approved bidders list nor did PEE even submit a bid during the formal solicitation period. Instead, after objecting to the security firm that had submitted a formal bid, appellant obtained the contract for PEE on a negotiated basis with the help of HUD official William Belcher, a friend of Booth's. Tr. 3070–83.

Although Clifton Terrace began to pay the Special Police in 1975, it was not until 1977 that the "contract" between it and P.I., dated July 1,

1975, was actually drafted and signed so that it would be available for HUD auditors. The signature of Curtis Clark, the security director in 1975, was forged by a secretary in the presence of Treadwell, Booth, Lee, and Laney. Tr. 2642–48, 3128.

6. From the Special Police accounts, appellant received $9,900 in direct payments and a $1,000 check payable to a Jamaican resort as a Christmas bonus. Lee and Booth respectively received $4,426.25 and $13,599.74 in direct payments. Special Police funds also were used to benefit appellant's other businesses, including Kiosk, an advertising agency later made part of T. Barry, Sticks and Stones, and Buena Vista. Tr. 2661–76, 3260–62.

7. These personal services included construction work at Lee's home and various houses owned by Sticks and Stones, chauffeuring Booth's daughter to and from school, building a fireplace at appellant's home under her father's direction, and cashing checks and delivering the proceeds to Treadwell, Booth, and Lee. Tr. 2655–56, 3132–33, 3194, 3207–11.

8. For the period 1975–78, Special Police received just over $145,000 from Clifton Terrace— 72.25% of its total income. It received $38,000, or 19% of the company's total income, from the Kenesaw Apartments during the period of its one-year contract. No income was received from Buena Vista. The Special Police maintained offices at Clifton Terrace for which it paid one dollar per year in rent. It shared the space with Sticks and Stones, which paid the same amount, and P.I. Properties. Tr. 2537–40. According to a former security guard, however,

Tr. 2642, 2648, 2654, 3129–32, 3192, 3206. No other security personnel covered the needs of Clifton Terrace when the guards performed these additional tasks during their assigned shifts. Tr. 2654–55, 3133, 3195, 3200, 3209, 3211. In addition to the Special Police contract, PEE's landscaping division received a total of $18,617 in payments from Clifton Terrace, in some instances for work either wholly or partially unperformed. Tr. 2612–20.

Between June and December 1976, P.I. obtained three bank loans by improperly pledging Clifton Terrace tenant security deposits as collateral. Two of the loans were deposited in PES bank accounts and used to fund new business ventures. A portion of another loan was used to acquire property for Sticks and Stones, the for-profit housing rehabilitation company set up by Treadwell and Lee in 1976. Neither the loans nor the collateralization of the security deposits were reported to HUD on the project's monthly accounting reports ("the ABC's").[9] Tr. 3354–95, 3455–73, 3943–56.

Booth and Lee routinely helped themselves to Clifton Terrace funds for a plethora of personal and non-project purposes. Heating oil for Buena Vista was paid for on several occasions with Clifton Terrace operating funds, while Clifton Terrace tenants were often without heat during the same periods. Tr. 2460, 2483–84, 2499, 2500–11, 3138, 3200–01. Project funds were used to pay Booth's legal fees in a child custody suit and for painting and carpeting the offices of the Kiosk Advertising Agency, another company owned by appellant. Significantly, neither Booth nor Lee had any ownership or other interest in Kiosk.[10] In addition, Lee on several occasions misappropriated checks sent to Clifton Terrace by the company owning the project's coin-operated washers and dryers. Tr. 2601, 3003–05. Zellene Laney testified that after she brought the matter to Booth's attention, the latter telephoned appellant in Laney's presence to inform her of Lee's misconduct. Immediately thereafter, Booth told Laney that appellant was aware of Lee's activities and that she told her (Booth) that she (appellant) and Lee were going to start a new business with the money. Tr. 2601–03. Many of these improper expenditures were either misreported or not reported on the monthly ABC reports.

By the summer of 1976, the Department had become increasingly concerned about the financial health of the project. P.I. was behind in its mortgage payments and had provided HUD with neither a 1975 audited financial statement or the monthly ABC's required by the regulatory agreement. Tr. 3552–57, 3560–61, 3699–3700. Appellant responded to HUD's increased scrutiny by employing her fiance, Ronald Williams, an accountant, and two of his professional associates to review the project's books in preparation for an audit.

Special Police and P.I. "were all the same" and Robert Lee managed the day-to-day affairs of Special Police in addition to those of P.I. Tr. 3125, 3128.

9. These reports were comprised of three separate schedules: Schedule A summarized income, Schedule B detailed disbursements, and Schedule C listed accounts payable. Tr. 2468–70, 3560–61. During a six-month trial period prior to consummation of the sale, P.I. had prepared these reports monthly. After title to the project passed, however, P.I. stopped submitting the ABC's even though required to do so under the regulatory agreement. After HUD audited the project books in spring 1977, appellant and Zellene Laney in the summer of that year prepared and submitted the June 1976 through May 1977 reports in toto. Alleged mis-statements in these reports constituted the basis for the majority of the false statement counts in the indictment. The November 1976 ABC, for example, reported the payment for a new refrigerator for Lee's home as used for two refrigerators for Clifton Terrace, and the shipping invoice was altered to reflect this. Tr. 2543–48. Similarly, a new refrigerator for a P.I. secretary living at Buena Vista was reported on the April 1977 ABC as a payment for a new Clifton Terrace refrigerator.

10. In March 1976, Kiosk Advertising was made a division of T. Barry Associates. Clifton Terrace funds were also used by Lee to purchase property at 1529 A Street; the deed, however, was issued in the name of T. Barry Associates, a company in which Lee had no interest. Tr. 2527–32, 3133–34, 3181–85, 3196–97, 3928–30.

Tr. 2470–71, 3418–24, 3430, 3435–38. Williams and his associates were not qualified to conduct such an audit under HUD rules, Tr. 3426–27, 3441–42, and appellant did not reveal her personal relationship with Williams to HUD. Tr. 3654–55, 3710–13. Although Williams never performed the audit and HUD later informed appellant that Williams would not be an acceptable auditor under its rules, three payments totaling $5,304 were made to Ronald Williams as compensation for his accounting services. Tr. 2581–89, 3778–81.

Despite repeated requests from HUD and repeated promises by appellant, no audit was forthcoming and the conspirators frequently resisted HUD's efforts to monitor the project's books. Tr. 3638–46, 3781–82. Laney testified that appellant and the co-conspirators in late 1976 and early 1977 destroyed and altered invoices and checks to conceal the various non-project disbursements in the event HUD conducted an audit. Tr. 2471–72, 2476, 2780–82.

Its patience exhausted, the Department finally conducted a partial audit in the spring of 1977.[11] In response to HUD's findings, appellant and Laney prepared the overdue ABC's for the past year, determined which expenditures were to be reimbursed, and submitted the report and reimbursement checks to HUD that summer. At HUD's behest, Treadwell also removed Lee as general manager of Clifton Terrace and began to take a more active role in supervising the project's daily operations. Tr. 3736–37, 4824. After another year in which the financial and physical condition of the project continued to deteriorate, and during which appellant continued to promise and then fail to deliver the required audited financial statements, the Department in July 1978 foreclosed on the property. Tr. 3867–68, 3872–73.

11. The Department's auditors were able to conduct only a limited review of the Clifton Terrace books because too many necessary records were missing. Tr. 3656. The auditors' final report found, however, that in general P.I.'s records, including the monthly accounting reports, were incomplete or missing; the corporation had failed to provide HUD with annual audited fi-

### B. The Defense

It was conceded by both sides that both Booth and Lee misappropriated project funds on numerous occasions. Appellant claimed, however, that because she was not involved in the daily management of the project, she was completely unaware of the wrongdoing of her subordinates. Once she learned of their misdeeds in the spring of 1977, she took steps to rectify the damage done by reimbursing the project and firing Lee. She emphasized that there was no direct evidence that she had ever agreed to or authorized their misuse of Clifton Terrace assets. She also proffered evidence that the management fees paid to P.I., the monies received by PEE Special Police, and the compensation she received as an officer from these sources were entirely reasonable and proper. She also emphasized a number of apparent inconsistencies and errors in the testimony of Zellene Laney, the project's former bookkeeper and the government's principal witness.

### II. SUFFICIENCY OF THE EVIDENCE

Appellant contends that because the government failed to sustain its burden of proof, the trial court erred in denying her motion for acquittal on the conspiracy count. In support of her claim, she argues that the government offered no proof that she agreed to a conspiracy to defraud the United States by misappropriating, misapplying, diverting, and stealing project assets. She argues that, even if the government had successfully established her participation in concealment of the misappropriations from HUD, involvement in the cover-up of an already executed crime would not, standing alone, necessarily show participation in the main purpose of the conspiracy. *See Grunewald v. United*

nancial statements certified by an independent public accountant; the corporation had paid for items without soliciting bids to determine whether the same items could be obtained at lower prices; unnecessary disbursements had been made; and documentation to support disbursements was often inadequate or missing. Tr. 3656–58.

*States*, 353 U.S. 391, 404–05, 77 S.Ct. 963, 973–74, 1 L.Ed.2d 931 (1957). We reject these arguments and sustain the trial court's determination that the evidence of Treadwell's complicity in the main conspiracy was sufficient to support the jury's verdict.

In ruling on a motion for a judgment of acquittal, "the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir.1977); *accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Upon review, the appellate court must apply the same standard. *See Crawford v. United States*, 375 F.2d 332, 334 (D.C.Cir.1967). Thus, the trial court may take the case from the jury "only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Davis*, 562 F.2d at 683.

This case is troubling because the government's evidence against Treadwell was almost entirely circumstantial, and the majority of her actions were susceptible to logical and innocent explanations. In determining whether the government has met its burden of proof, however, no legal distinction may be drawn between direct and circumstantial evidence, *id.* at 684,[12] since it is "the traditional province of the jury to assess the significance of circumstantial evidence, and to determine whether it eliminates all reasonable doubt." *United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir.1978). *See also Glasser*, 315 U.S. at 80, 62 S.Ct. at 469 ("Participation in a criminal conspiracy need not be proved by direct evidence, a common purpose and plan may

be inferred from a 'development and a colloration of circumstances.'" (citation omitted)). Similarly, the government, when using circumstantial evidence, need not negate all possible inferences of innocence that may flow therefrom. *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954); *United States v. Lewis*, 626 F.2d 940, 951 (D.C.Cir.1980).

To establish a criminal conspiracy under section 371, the government must prove beyond a reasonable doubt that: (1) two or more persons formed an agreement either to commit an offense against or defraud the United States; (2) the defendant knowingly participated in the conspiracy with the intent to commit at least one of the offenses charged or to defraud the United States; and (3) at least one overt act was committed in furtherance of the common scheme. *See United States v. Andreen*, 628 F.2d 1236, 1248 (9th Cir.1980); *Pinkerton v. United States*, 145 F.2d 252, 254 (5th Cir.1945).

Treadwell argues that the government failed to prove the second element of the crime because she never authorized or agreed to any misappropriation of Clifton Terrace funds. Rather, she claimed throughout the trial that she was the innocent victim of the illegal misappropriations by Booth and Lee, that she never took funds directly from Clifton Terrace for personal use, and that when she learned of her subordinates' wrongdoing, she took steps to rectify the defalcations. Any efforts to conceal the misdeeds from HUD resulted from her desire to avoid the risk of foreclosure by remedying the problems personally, not for the purpose of furthering the main conspiracy.

---

**12.** As the Supreme Court has stated:

Circumstantial evidence ... is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.
*Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed.2d 150 (1954).

The government's case, however, described a scheme whose contours were far broader than one involving simple theft from the Clifton Terrace till. Instead, the government sought to prove Treadwell's participation in a scheme that encompassed not only the brazen malefactions of Booth and Lee, but also a general pattern of self-dealing, conflicts of interest, and shoddy management practices through which the conspirators illegally enriched both themselves and their other businesses at the expense of Clifton Terrace. P.I. and the other Pride-affiliated companies entered into a series of questionable and self-dealing transactions detrimental to the interests of Clifton Terrace and its tenants. The Special Police contract, P.I.'s management of the Buena Vista and Kenesaw apartments, and the landscaping and gardening services paid for in full but only partially performed were prominent examples.

Appellant argues, however, that these transactions were not necessarily harmful to Clifton Terrace. She points out, for instance, that the PEE Special Police received less compensation than did the company that had formerly provided security services. Her argument misses the point. The situation created by these conflicts of interest in itself proved adverse to Clifton Terrace and its tenants. In every such transaction, there was an incentive to favor the interests of Treadwell's other companies over those of Clifton Terrace's tenants, and the evidence showed a consistent pattern in which that risk materialized. Zellene Laney testified, for example, that certain project expenses, including P.I.'s management fee and the Special Police security fee, were always paid even though expenses like fuel and electric bills were not. Tr. 2514–16. Clifton Terrace operating funds were used to decorate the offices of the Kiosk Advertising Agency and to purchase property for use by other Pride companies. Tenant security deposits were collaterized against loans P.I. obtained for the benefit of appellant's other businesses in violation of the HUD regulatory agreement. The salary Treadwell received from P.I., a $1,000 "bonus" Jamaican Christmas vacation received from the Special Police account, and other payments depended directly on the flow of Clifton Terrace funds. Former Special Police and Clifton Terrace employees testified that security personnel were routinely diverted from their duties at Clifton Terrace and used to perform personal services for the conspirators and security services for Buena Vista and Kenesaw. Similarly, payments were made to Ronald Williams, Treadwell's fiance, ostensibly for his work as an "independent" auditor auditing the Clifton Terrace accounts, even though no audit was ever completed by him,[13] and neither he nor his firm were qualified, under applicable HUD regulations, to perform the work. In short, in every transaction there was a potential for improper favoritism, and as the government's case demonstrated, too often that potential was realized.

Treadwell claimed she knew nothing about any of the improper expenditures made by Booth and Lee. The jury knew, however, that appellant had a close personal relationship with her sister, Joan Booth, and was closely associated with Lee in this as well as other businesses. It heard testimony that she held regular meetings with Lee and Booth in order to supervise their management of the project. It knew from her own testimony that she had extensive experience as a government-grant entrepreneur and that she therefore was accustomed to obtaining government money to

---

**13.** Indeed, there is nothing in the record that shows Williams ever did anything other than examine the project's books in November 1976. In addition, the timing of at least one of the payments was suspicious. That payment, the largest of the three, was in the form of a $3,500 wire transfer to Williams' New Jersey bank account on August 31, 1977—nine months after the November 1976 review. Appellant requested that Zellene Laney wire the money rather than prepare a check because Williams needed the money immediately to pay for the couple's wedding expenses. Tr. 2588–90. In the course of his review of the 1976–77 ABC's, HUD official John Gifford questioned the three disbursements to Williams. None of these expenditures, however, were reimbursed to the project. Tr. 3776–81.

finance various "self-help" enterprises, managing those enterprises, and accounting to the government for how that money was spent. Combining these factors with the sheer magnitude of the abuses at Clifton Terrace, many involving other businesses that she controlled, would fully support a reasonable inference that Treadwell knew of and condoned her subordinates' malfeasance.

Finally, the government presented testimonial and documentary evidence that Treadwell attempted to conceal the extent of the wrongdoing from HUD by temporizing in the face of HUD's demands for audited financial statements and by destroying and altering invoices and reconciling checks so that the expenditures would appear to be proper Clifton Terrace disbursements. Treadwell claimed, however, that her efforts were directed solely toward rectifying the damage done by her subordinates and that the testimony of Zellene Laney that Treadwell altered and destroyed documents was "thoroughly impeached" on cross-examination. As we have stated, however, the government need not negate every inference of innocence that may flow from a given set of events. More important, it is the province of the jury to assess the credibility of witnesses, and the jury thus was entitled to believe Laney or disbelieve Treadwell as it deemed fit.

Based on the voluminous evidence presented and viewed in a light most favorable to the government, we find that the trial judge properly denied Treadwell's motion for acquittal on the conspiracy count.

### III. The Jury Instructions

#### A. *Object of the Conspiracy*

Count One of the indictment, the conspiracy charge, purports to describe "the conspiracy" in paragraph 11 and the "object of the conspiracy" in paragraph 12:

#### *THE CONSPIRACY*

11. From in or about May 1974 to in or about August 1978, within the District of Columbia and elsewhere, defendants MARY TREADWELL ROBERT E. LEE, JOAN M. BOOTH, CHARLES W. RINKER, JR. and RONALD S. WILLIAMS did knowingly and willfully conspire, combine, confederate and agree together and with each other

(a) To commit offenses against the United States, including:

(1) Violations of Title 18, United States Code, Section 1001, Falsifying and Concealing Material Facts and Making False Statements to a Department or Agency of the United States, as alleged in Counts Two through Seventeen of this Indictment;

(2) Violations of Title 18, United States Code, Section 1343, Wire Fraud, as alleged in Count Eighteen of this Indictment; and

(b) To defraud the United States and its agencies of their lawful right to conduct their business and affairs, particularly HUD's housing programs for low and moderate income tenants and IRS' administration and enforcement of the tax laws of the United States, free from deceit, fraud, misrepresentation and theft. (r. 110 at 4–5).

#### *OBJECT OF THE CONSPIRACY*

12. It was the object of the conspiracy for the defendants to unjustly and illegally enrich themselves and the other businesses which they directed and controlled by using P.I. Properties to acquire Clifton Terrace and thereafter to misappropriate, misapply, divert and steal monies and assets from Clifton Terrace and the other housing projects which P.I. Properties owned or managed and to hide, conceal and cover up such misappropriation, misapplication, diversion and theft.

In its instructions to the jury, the trial court read most of Count One, including paragraphs 11 and 12, along with a general and detailed explanation of the law of criminal conspiracy taken from the standard District of Columbia Bar Association, Crim-

inal Jury Instructions for the District of Columbia, No. 4.92 (3d ed. 1978). Appellant argues that this instruction failed to adequately explain to the jury that it was required to find a conspiracy with the single "object" set forth in paragraph 12.[14] Because of this omission, the jury "had no way of knowing" that the critical issue in the case was "whether Mary Treadwell had conspired to misappropriate Clifton Terrace funds." Brief for Appellant at 57. The trial court compounded its error, appellant contends, by informing the jury that the conspiracy had many objects and the jury need only find that one of the illegal objects was contemplated in order to convict the defendant. As a result, each juror was able to convict the defendant for any one of several purported frauds and misdeeds described in the means and methods and overt acts paragraphs of the conspiracy count, in violation of appellant's right to a unanimous jury. Brief for Appellant at 55.

At the outset, it is important to state what is *not* at issue here. Appellant is not contesting the sufficiency of the grand jury's indictment, nor is she claiming that the proof offered at trial failed to conform to the allegations contained therein. For its part, the government does not dispute appellant's assertion that the government was required to plead and prove Treadwell's participation in a particular fraudulent scheme in order to prevail. Rather, appellant seems to claim that the instruc-

tions inadequately informed the jury that it was required to find the particular fraudulent scheme described in paragraph 12.

The existence of an "agreement" is the essential element of the statutory crime of conspiracy. As the Supreme Court stated in *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101–02, 87 L.Ed. 23 (1942), "[t]he gist of the crime of conspiracy as defined by the statute is the agreement or confederation of the conspirators to commit one or more unlawful acts." Because it is the conspiratorial agreement that the statute punishes, a single agreement may have multiple objects.[15] *Id.* 317 U.S. at 53–54, 63 S.Ct. at 101–02. Thus, a single conspiracy may contemplate, as in this case, the violation of one or more federal statutes in addition to defrauding the United States.

■ Although the government in order to prove an agreement need not show that the conspirators agreed on the details of their criminal scheme, it is required to show the "essential nature of the plan." *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947). This is because the agreement itself is the crime, and "it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555

14. Appellant's proposed jury instructions on this issue read as follows:

The first matter for you to determine is whether or not you are convinced beyond a reasonable doubt that two or more persons willfully conspired to defraud the United States at or about the time alleged in the indictment with the object to unjustly and illegally enrich themselves and their businesses and to misappropriate, misapply, divert and steal monies and assets from Clifton Terrace and other housing projects, and thereafter to hide, conceal and cover up same. In other words, you must determine whether the alleged conspiracy existed prior to the commission of the first overt act done to further the conspiracy. If you are not convinced beyond a reasonable doubt that the alleged conspiracy existed, you must find the defendant not guilty.

15. Courts have sometimes used the term "object" to refer to the crimes which the conspiracy contemplates as well as to the "essential nature" or purpose of the agreement. Indeed, in this case the government captioned paragraph 12, which describes the "essential nature" of the Clifton Terrace scheme, as the "object" of the conspiracy. While we would wish for greater precision in the use of this term, the mere labeling of a single paragraph cannot be decisive. Rather, the crucial inquiry is whether, when read as a whole, the jury understood from the instructions what it was required to find in order to convict Treadwell of conspiracy. *See United States v. Martin*, 475 F.2d 943, 947 (D.C. Cir.1973) (jury instructions to be considered as a whole rather than as isolated passages).

(1965). *See also United States v. Perez,* 489 F.2d 51, 62 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *United States v. Rosenblatt,* 554 F.2d 36, 38 (2d Cir.1977); *United States v. Gleason,* 616 F.2d 2, 16 (2d Cir.1979), *cert. denied,* 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). Because the government is required to plead and prove that the alleged conspirators agreed to the same *type* of conduct, it cannot simply charge an offense by using the general language of the statute or the common law, but must accompany the generic language " 'with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.' " *Hamling v. United States,* 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1973) (quoting *United States v. Hess,* 124 U.S. 483, 487, 8 S.Ct. 571, 573–74, 31 L.Ed. 516 (1888)). *See also, United States v. Cruickshank,* 92 U.S. (2 Otto) 542, 558, 23 L.Ed. 588 (1875).

■ Here, paragraph 11 follows the general statutory language of 18 U.S.C. § 371 [16] and properly sets forth the multiple objects of the conspiracy: violations of 18 U.S.C. § 1001, violations of 18 U.S.C. § 1343, and defrauding the United States. Paragraph 12, along with the "means and methods" described in paragraphs 13–16,[17] serves as the particularized description of the generic crimes charged in paragraph 11 and provides the "essential nature" of the conspiratorial agreement. Indeed, even without paragraph 12, paragraphs 13–16 provided a description of the nature of the agreement sufficiently specific to satisfy the legal standard—and appellant conceded this at oral argument.

The judge read *both* paragraphs 11 and 12, as well as paragraphs 13–16, as part of the instructions and sent the indictment itself to the jury room. This was clearly sufficient to inform the jury of the "essential nature" of the conspiratorial agreement—the meeting of minds—that the government was required to prove beyond a reasonable doubt. The trial court further instructed the jury that, in determining whether this agreement was formed either to commit offenses against or defraud the United States, the jury need only find that one of the illegal objects specified in paragraph 11 was contemplated. That instruction was entirely proper, since a single agreement may have more than one object. *See Braverman,* 317 U.S. at 53, 63 S.Ct. at 101–02. Appellant's claim that the jury nonetheless "had no way of knowing" that the issue was "whether Mary Treadwell conspired to misappropriate Clifton Terrace funds" and was misled by the instructions regarding multiple objects is therefore without merit.

### B. *The Co-Conspirator Statement Instruction*

The trial court gave the following jury instruction regarding the permissible use of co-conspirator acts and declarations in assessing defendant's guilt:

In determining whether a conspiracy between two or more persons existed and whether the defendant was one of its members, you may consider the acts and the declarations of any other members of the conspiracy as evidence against the defendant whether done in her presence or out of her presence. *When persons enter into an agreement for unlawful purposes, they become agents for each other so that the act of one conspirator is considered the act of all the other*

---

**16.** 18 U.S.C. § 371 provides in relevant part that

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**17.** Paragraphs 13–16 generally describe a scheme to acquire control of Clifton Terrace through the formation of a sham nonprofit corporation, to use project funds for the enrichment of the conspirators and their businesses, and to misrepresent and conceal the nature of their operations from interested government agencies.

*conspirators and is evidence against all of the conspirators.* However, statements of any conspirator which are made before its existence or after its termination may be considered as evidence only against the person making such statements. In other words, ladies and gentlemen, in determining whether there was a conspiracy and whether the defendant Treadwell was a member of that conspiracy, you may consider as evidence against the defendant the *declarations or actions of her fellow conspirators in the conspiracy* whether they were done in or out of her presence while a conspiracy existed. *This is because when conspirators join in a common plan or scheme to accomplish an illegal purpose, everything which is said or done by one of them in furtherance of that purpose is deemed to be the statement of all who have joined in that conspiracy.*

Tr. 5706–07 (emphasis added). Appellant claims that the emphasized portions of this instruction undermined the presumption of innocence by communicating an implicit finding by the court that Treadwell was a member of the conspiracy.

■ Out-of-court statements of a co-conspirator are admissible if the government establishes that the statements were made in furtherance of a conspiracy of which defendant was a member. Prior to *United States v. Gantt,* 617 F.2d 831 (D.C.Cir. 1980), the jury determined the threshold question of admissibility. Since *Gantt,* however, the trial judge determines admissibility based on his finding that substantial independent evidence supports defendant's membership in the conspiracy. The jury instruction in question was taken from District of Columbia Bar Association, Crim-

inal Jury Instructions for the District of Columbia, No. 4.92 at 303 (3d ed. 1978). The judge did not deliver that portion of the instruction, now obsolete, which explained the standards by which a pre-*Gantt* jury would have determined admissibility.[18] Appellant contends, however, that retention of that part of the instruction dealing with how and why the statements could be used was prejudicial and misleading because it implied that the court had already found her to be a member of the conspiracy. The jury was not told, as it would have been under the old instruction delivered in full, that consideration of the statements hinged entirely on the jury's first finding membership in the conspiracy.

■ Despite the change in the law, however, we do not find that it is erroneous, misleading, or unnecessary to explain to the jury how and why they could consider these declarations in assessing the defendant's guilt or innocence. Rather, we find that an instruction explaining the use of co-conspirator statements may or may not be helpful to the jury, depending on the circumstances. Whether to give such an instruction is a matter within the sound discretion of the trial judge and therefore subject to the harmless error standard of review. We see no error here. A lay jury is unlikely to have knowledge or understanding of the vicarious liability principles underlying use of co-conspirator acts and statements or in what circumstances the acts and statements of one person may be imputed to another. Furthermore, a general description of the use of co-conspirator statements, coupled with an explanation of how the general rule would apply specifically to the case at issue, does not communicate a *finding* of defendant's guilt.[19] A

---

18. This deletion was clearly appropriate, and we join other circuits in disapproving the inclusion of the old instruction on the standard of admissibility. *See United States v. Enright,* 579 F.2d 980, 987 (6th Cir.1978); *United States v. Bey,* 437 F.2d 188, 191–92 (3d Cir.1971).

19. Appellant's reliance on *United States v. Pronger,* 287 F.2d 498 (7th Cir.1961), is misplaced. In *Pronger,* the trial judge ruled that co-conspirator statements were admissible because "once

there is sufficient evidence to establish a joint enterprise ... the alleged conversation of one alleged conspirator is binding on the alleged conspirators." The Seventh Circuit reversed, finding that the remarks had the effect of telling the jury that the government had proven the conspiratorial agreement. *Id.* at 500. That is a different case. The trial judge here made no reference to his own finding of admissibility or

court would be hard pressed to explain abstract legal concepts to a lay jury unless it could supplement the explanation with an example of how the rule would apply to the case under consideration.

The argument that an implicit finding of guilt was communicated is further weakened when the jury instructions are read as a whole. The instructions repeatedly emphasized the government's burden of proof and the guilt beyond a reasonable doubt standard, and routinely qualified its references to the conspiracy and conspirators with the word "alleged." Indeed, in the passage quoted above, the trial court qualified the entire paragraph with the phrase "in determining whether … defendant Treadwell was a member of the conspiracy." We therefore find no error in the jury instructions regarding co-conspirator statements.

### IV. DOCUMENT NOT IN EVIDENCE SENT TO JURY ROOM

Appellant contends that she is entitled to a new trial because a document that had not been offered into evidence was inadvertently sent to the jury room. Appellant claims that she was prejudiced because the document mapped out the government's theories of liability on the ABC false statement counts, including one theory never aired at trial but on which the jury verdict appears to have been based.

The prosecution had used the one-page document during the trial to summarize the testimony of FBI agent Philip Buvia, a government witness, regarding his review of the June 1976 ABC schedule. It listed in

capsule form five items either not reported or misreported on that schedule. The May laundry money misappropriated by Lee was not reported as either a receipt or a disbursement nor were the proceeds of a $9,000 bank loan taken out by P.I. for use by PES. In addition, neither the fact or amount of tenant security deposits pledged as collateral for that loan were disclosed.

In *Dallago v. United States*, 427 F.2d 546 (D.C.Cir.1969), we held that consideration by the jury of documents not in evidence is error, and if prejudice is shown, the conviction will be reversed and a new trial ordered. *Id.* at 553. Nonconstitutional error is prejudicial if one cannot reasonably conclude that the judgment was not substantially swayed by the error. *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Dallago*, 427 F.2d at 560; *Leigh v. United States*, 308 F.2d 345, 346 (1962).

In assessing the magnitude and gravity of the error in *Dallago*, we recognized that when an extraneous document submitted to the jury is merely cumulative of other, properly admitted evidence, the transmittal is harmless error. *Dallago*, 427 F.2d at 559.[20] The items listed on the document did nothing more than restate in an abbreviated form the testimony of Agent Buvia. He testified that the $9,000 Independence Federal loan was not reported as either a receipt or disbursement on the June 1976 ABC schedule. Tr. 3945–47. He testified that the laundry money was not reported on the June and August through November ABC schedules.[21] Tr.

the basis for that finding; he merely explained a legal rule.

**20.** *See also, United States v. Siragusa*, 450 F.2d 592, 594–95 (2d Cir.1971) (no prejudice where information contained in erroneously transmitted material had been introduced at trial), *cert. denied*, 405 U.S. 974, 92 S.Ct. 1195, 31 L.Ed.2d 248 (1972); *United States v. Warner*, 428 F.2d 730, 737–38 (8th Cir.) (information contained in audit report erroneously sent to jury stated nothing more than what jurors heard in actual testimony), *cert. denied*, 400 U.S. 930, 91 S.Ct. 194, 27 L.Ed.2d 189 (1970).

**21.** Appellant argues that no evidence was presented that the money *should* have been reported; therefore the document advanced a theory to the jury to which the defense had no opportunity to respond. We disagree. Even if there had been no other evidence that the money "should" have been reported, the statement on the document, like Buvia's testimony, merely said the money had not been reported. Equally implicit in both Buvia's testimony and the notation on the document, however, is the notion that the money should have been reported but was not, and defense counsel had ample opportunity to cross-examine Buvia on this point. We therefore reject appellant's argument that fail-

3956. Finally, he testified that the tenant security deposits were improperly collateralized against the $9,000 loan, and the collateralization was not disclosed on the June ABC. Tr. 3951–52.

Appellant contends, however, that even if the document was cumulative of other testimony, it was nonetheless prejudicial. Citing *United States v. Adams*, 385 F.2d 548 (2d Cir.1967), and *United States v. Ware*, 247 F.2d 698 (2d Cir.1957), she asserts that the error was prejudicial because the Buvia summary gave the jury a "neat condensation" of the government's theories of liability on the ABC reports and thus gave the government an unfair advantage.

*Adams* and *Ware*, however, are both distinguishable from this case. Those cases involved prosecutions for the unlawful sale and possession of narcotics. The jury was allowed to consider in their deliberations the government agent's notations on envelopes used to deliver the illegal substance to an examining chemist. Both courts found that submission of these statements was prejudicial because the notations provided a complete summary of the government's entire case against the defendant, and the trial judge allowed the jury to consider the exhibits in their deliberations. *Adams*, 385 F.2d at 550; *Ware*, 247 F.2d at 700.

The present case differs in two respects. First, the document here did not summarize the government's entire case against the defendant as it did in *Ware* and *Adams*, both of which involved the simple charge of possession and sale of narcotics and hinged almost entirely on the testimony, fully summarized on the envelopes, of undercover agents who had purchased the illegal drugs. Indeed, the Buvia summary did not even fully summarize the government's

case on the ABC false statement counts, let alone encompass the entire case against the defendant. The document merely listed, as objective facts, items testified to by *one* government witness about the ABC for *one* month. There was documentary evidence as well as extensive testimony from numerous witnesses regarding the ABC's and what items were or were not reported on them well beyond those items covered by the Buvia summary.

Appellant would attach great significance to the fact that the six false statement counts for which she was convicted were for months in which the laundry money was not reported. Counts 3–7 and 9–15 of the indictment alleged that false statements were made on each monthly report from June 1976 to May 1977. The jury, however, convicted only on Counts 6, 9, and 11–15, covering respectively, April 1977, June 1976, and August-November, 1976— the months for which no laundry income appeared on the ABC's. Appellant argues that this is strong evidence that she was prejudiced by the Buvia summary, which stated that no laundry income was reported for June 1976.

The persuasiveness of the argument is blunted, however, by evidence of other false statements made in the ABC's for these same months. The false statement counts covering the months in question exactly correlate with Clifton Terrace checks written during that period for non-project purposes and then either not reported or misrepresented on the June 1976, August-November 1976, and April 1977 ABC reports.[22] Additionally, we note that the Buvia summary by its own terms only covered the June 1976 ABC, and that the government never claimed that any laundry money was misappropriated by Lee after 1976

---

ure to report laundry income was a theory never aired at trial.

**22.** Exhibit A to Appellant's Brief reflects the improper expenditures for the months in question. Although these were not the only months in which such expenditures were made, all of

the other months were outside the time period covered by the ABC false statement counts. None of these disbursements were correctly reported on the applicable ABC.

Brief for Appellant, Exhibit A.

or that the April 1977 ABC did not report laundry income.[23]

Second, the record persuades us that the Treadwell jury did not consider the Buvia summary in their deliberations as did the *Ware* and *Adams* juries. On the sixth day of the twenty-day deliberations, the jury sent the following note to the court:

We have encountered a document entitled "Summary of Specific Items from June 1976 Schedules ABC" stuck in the folder for August 1977 ABC report schedules. We question as to whether this document was received into evidence, and therefore whether the jury should consider it. (7/15/83 Tr. 2; 7/16/83 Tr. 17–18; R. 118, unpaginated document).

Brief for Appellee at 63.

The court responded by immediately retrieving the document and instructing the jury that the document was not in evidence and should not be considered by them. The jury's question as to "whether they should consider" the document suggests that they

CLIFTON TERRACE CHECKS FOR NON–PROJECT PURPOSES

| CITATION | DATE & PAYEE | PURPOSE | AMOUNT | NATURE |
|---|---|---|---|---|
| Tr. 2497–503; 2509–11; GX 70, 71, 72, 73, 161, 162, 164, 166, 167, 169, 170, 171, 172 | Jan., Apr., June 1976 Amerada Hess | Buena Vista | 8,860.01 | Oil |
| Tr. 2507–08A; GX 127, 130, 131 | Aug. 1976 Enterprise 101 | Kenesaw | 850.00 (from two security dept. acc'ts) | Contracting |
| Tr. 2528–30; 2532–36; 3692; GX 98, 100, 106, 514, 683, DX 3035 | Sept. 1976 Cash | Purchase 1529 A St. | 1,544.66 −1,400.00 net   144.66 | Purchase 1529 A Street |
| Tr. 2540–43; GX 120, 122, 123, 124 | Sept. 1976 Ace Electric | Lee's residence | 618.40 | Contracting |
| Tr. 2516–18; GX 93, 94, 95 | Sept. 1976 P. Harris | Booth personal | 1,145.65 | Legal fee |
| Tr. 2524–26; GX 55 | Oct. 1976 Metro Decorating | Buena Vista & Kenesaw | 541.00 | Fixing Apts. |
| Tr. 2543–48; GX 143, 144, 145 | Oct.–Nov. 1976 G.E. Hotpoint | Lee's residence | 717.55 | Refrigerator |
| Tr. 2573–75; GX 150, 151, 156, 158 | Apr. 1977 | Buena Vista | 251.35 | Refrigerator |

23. Tr. 3956–57. Appellant urges, however, that the salient factor is that laundry income was not reported on the April ABC. Although the April money was not reported on the April report, however, the March 1977 ABC reported laundry income for *two* months—one of which necessarily included April, since all other 1977 ABC's showed laundry income. That the March report would reflect the following month's income is explained by the fact that none of the ABC's at issue were prepared until the summer of 1977.

did not do so and instead postponed their consideration pending the court's instruction. Because we find that the document was merely cumulative of other evidence properly admitted at trial and that the jury did not consider it in their deliberations, we find the error harmless.[24]

24. Appellant claims that the government knowingly presented perjured testimony before the grand jury and that the three tax evasion counts were improperly joined. We have considered both arguments and find them meritless for the reasons given by the district court. *See United States v. Treadwell,* 594 F.Supp. 831 (D.D.C.

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

1984); *United States v. Treadwell,* 566 F.Supp. 80, 85–87 (D.D.C.1983). We have also considered appellant's argument that her presentence report should be corrected and the case remanded for resentencing and find it without merit.