**UNITED STATES of America, Appellee**

v.

**Jennifer Juliet GATLING, Appellant.**

**Nos. 95–3064, 95–3074.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 3, 1996.

Decided Oct. 8, 1996.

Shawn Moore, Washington, DC, appointed by the Court, argued the cause and filed the briefs for appellant Jennifer Juliet Gatling.

Richard Seligman, Washington, DC, appointed by the Court, argued the cause and filed the briefs for appellant Cheryl Douglas Walker.

Jeanne M. Hauch, Assistant United States Attorney, argued the cause for appellee, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Roy W. McLeese, III, Craig S. Iscoe and Shanlon Wu, Assistant United States Attorneys, Washington, DC, were on the brief. E. Vaughn Dunnigan, Elizabeth Trosman and Thomas J. Tourish, Jr., Assistant United States Attorneys, Washington, DC, entered appearances.

Before: WALD, SILBERMAN and SENTELLE, Circuit Judges.

WALD, Circuit Judge:

Appellant Jennifer Gatling ("Gatling") and appellant Cheryl Walker ("Walker") were each convicted of conspiracy to commit bribery in regard to the illegal issuance of section 8 subsidies through the Section 8 Division of the District of Columbia's Department of Public and Assisted Housing ("DPAH"). Walker was also convicted of one count of making false statements while Gatling was also convicted of four counts of bribery. Appellants raise various challenges to their convictions here, arguing in the main that there was insufficient evidence to support their conspiracy convictions. We find that there was sufficient evidence for the jury to find appellants guilty of engaging in a single conspiracy to commit bribery, and that appellants' other challenges, with one exception, are without merit or ultimately unavailing. We therefore affirm all but one of their convictions and Walker's sentence.

## I. BACKGROUND

Section 8 is a federal housing assistance program administered through local public housing authorities. Under the section 8

program, qualified applicants can obtain subsidies in the form of vouchers or certificates to help cover their rent.[1] From 1988 through 1992, section 8 subsidies were distributed in the District of Columbia by the Section 8 Division of DPAH. Walker began working at DPAH in 1989 as Chief of the Section 8 Division, and became Acting Administrator of the Subsidized Housing Administration at DPAH in 1992. From 1989 to 1993, Gatling was a Housing Specialist in the Section 8 Division. Both Walker and Gatling were suspended from their positions at DPAH in 1993.

Under federal and D.C. regulations in effect from 1989 to 1993, section 8 subsidies were only available to D.C. residents who met certain income requirements and were on a wait list for subsidies. The wait list was necessary because only a limited number of subsidies were given to DPAH and other local housing authorities each year, and the demand for section 8 subsidies far outstripped the supply of available subsidies. The wait list was divided into several categories based on different need criteria, such as "homeless and living in a D.C. shelter" or "living in a unit unfit for habitation," and within each category applicants were listed by the date and time of their application. The regulations established preferences among these need categories and required that subsidies be offered first to applicants in the highest need category. Only when everyone in this category had received a subsidy could subsidies be offered to individuals in the next highest need category, and so on. Within each category, subsidies were to be offered to applicants in accordance with their position on the wait list. The regulations also provided that 10 percent of the subsidies could be allocated to lower preference need categories even if individuals in higher preference categories had not received subsidies. Individuals were required to apply in person for section 8 subsidies unless they were elderly or disabled, and applicants often remained on the wait list for several years before they obtained subsidies.

The federal government and D.C. police began investigating allegations that section 8 subsidies were being improperly issued through DPAH in January 1993. Walker and Gatling were transferred to another department, the Office of Emergency Preparedness, in February 1993 and were arrested in April 1994. On September 9, 1994, a grand jury charged Walker and Gatling with conspiring to accept bribes in return for section 8 subsidies. Walker and Gatling were also charged with several counts of accepting bribes, mail fraud, and making false statements. Trial began on November 29, 1994, and lasted more than six weeks.

At trial, the government claimed that in exchange for bribes Walker and Gatling gave section 8 subsidies to individuals who were not eligible to receive them because they were not D.C. residents and were not on the wait list, or, if they were on the wait list, were not next in line in the appropriate need category. The government offered evidence indicating that several Chicago residents had applied for and received section 8 subsidies through DPAH by mail, using false D.C. addresses, and then transferred the subsidies to Chicago. A critical witness for the government regarding subsidies received by Chicago residents was Anthony Bufford ("Bufford"), who pled guilty to attempted bribery. Bufford, who knew Walker's sister, testified that he contacted Walker about arranging a section 8 subsidy for his former wife, Veronica Bufford. He stated that Walker told him to contact Walker's assistant, Gatling, to get help on filling out the section 8 application, even though Walker knew that Veronica Bufford was a Chicago resident. Veronica Bufford testified that Gatling assisted her in submitting a section 8 application which falsely claimed that Veronica Bufford lived and worked in D.C. Bufford also reported that he told Walker he would "make it worth her while," that he offered Walker $1,000 after Walker had said she would arrange for Veronica Bufford to receive a subsidy, and that he sent Walker $1,000 when the section 8 voucher arrived in the mail. Transcript ("Tr.") at 313. A copy

---

1. Section 8 vouchers and certificates are substantially similar and differ primarily in the method used to calculate the amount of subsidy an applicant will receive. As used here, "section 8 subsidies" refers to both vouchers and certificates.

of Veronica Bufford's section 8 voucher, dated June 28, 1991, was introduced into evidence.

Bufford further testified that he later contacted Walker about arranging a section 8 subsidy for Camilla Perkins–Henry ("Perkins–Henry"), the widow of a friend of Bufford's. According to Bufford, he told Walker that Perkins–Henry was a Chicago resident and Walker stated that she "would do basically what she had done" for Veronica Bufford. Tr. at 324. Bufford also stated that he offered to make the same payment of $1,000, that Walker suggested he make the check out to Gatling because Gatling needed the money, and that Perkins–Henry was referred to Gatling for help in filling out the application. Perkins–Henry testified that she spoke to Gatling in regard to her section 8 application and gave Bufford a check for $1,000 made out to Gatling. The government introduced a copy of Perkins–Henry's section 8 voucher, dated March 9, 1992, and a copy of a canceled check for $1,000 she made out to Gatling, dated March 20, 1992, that had been deposited to Gatling's account.

The government also offered substantial evidence on section 8 subsidies that were issued to D.C. residents in exchange for money. The evidence consisted mainly of testimony from individuals who had obtained subsidies in this fashion from September 1991 through April 1992. According to these witnesses, they had heard through either Darnell Jackson ("Jackson") or Rodney Knight ("Knight") that section 8 subsidies were available for $500, and that once they had the $500 in cash, either Jackson or Knight, or both, drove them to DPAH. Several of these witnesses also testified that Jackson told them what documents to bring, such as their children's birth certificates, and instructed them to carry the money in an envelope. At DPAH, Gatling took the applicants back to her office and filled out the necessary paperwork. The section 8 subsidies were usually provided at the same meeting, after the paperwork was completed and the applicants had given Gatling the $500. Most witnesses testified that they put the envelope containing $500 on Gatling's desk and that Gatling put the envelope in a desk drawer. One

witness testified that she gave the $500 to Jackson and thought she saw Jackson slip the money to Gatling when he hugged her goodbye. There was also evidence that the individuals who testified to receiving section 8 subsidies in this fashion either were not on the section 8 wait list at the time or, if they were on the list, were not next in line for subsidies.

Jackson, who was charged with conspiracy to accept bribes and with aiding and abetting the acceptance of a bribe, did not testify at trial. Knight, who pled guilty to attempted bribery, did testify and his testimony corroborated that of the D.C. residents who had obtained section 8 subsidies with Gatling's help. Knight stated that Jackson was a friend of Gatling's and that on several occasions he heard Jackson tell recipients that Gatling was "splitting the money" with Walker. Tr. at 1827–28, 1844. According to Knight, Jackson made this statement "to convince whoever was getting a Section 8 voucher that it was all good." Tr. at 1844. Knight's niece Judy Johnson, one of the witnesses who paid Gatling for a section 8 subsidy, testified that she asked Jackson how Gatling could arrange the subsidies and he responded that Walker, "her supervisor[,] was in doing it with her." Tr. at 2404. Judy Johnson also testified that Gatling spoke with Walker about whether Johnson's section 8 certificate should be for a two or three bedroom apartment, and Cynthia Knight, who paid Gatling for a section 8 certificate for her handicapped sister, testified that Walker helped Gatling photocopy the documents that Knight had brought. The government also introduced evidence that Walker had deposited over $6,000 to her children's savings accounts between July 1991 and October 1992.

The defense's evidence consisted primarily of Walker's testimony, in which she acknowledged arranging section 8 subsidies for Veronica Bufford and Perkins–Henry but denied receiving any money in exchange. She stated that she believed she was authorized to provide section 8 subsidies to non-D.C. residents and to individuals not on the wait list in allocating the 10 percent of subsidies that did not go automatically to individuals in the highest preference need category. She also

claimed that the money in her children's accounts came from relatives. In its rebuttal, the government offered expert testimony by a new witness, Linda Pistelli ("Pistelli"), to the effect that Department of Housing and Urban Development ("HUD") regulations only exempted this 10 percent of section 8 subsidies from the requirement that these subsidies go first to individuals in higher preference categories, and not from the further requirements that individuals had to be on the section 8 wait list to receive subsidies and that subsidies had to be offered to individuals in order of their position on the list.

At the close of the government's case Walker made a motion for judgment of acquittal on the conspiracy and substantive bribery counts. The court first denied the motion, but later granted it in regard to the substantive bribery counts involving D.C. residents when the motion was renewed at the close of all evidence. On January 18, 1995, the jury convicted Walker of conspiracy to accept bribes and on one of the false statements counts. The jury acquitted Walker on all the other counts, except for one mail fraud count on which they were unable to reach a verdict. Gatling was convicted of conspiracy to accept bribes and four counts of accepting a bribe, and acquitted on all other counts. On May 30, 1995, Gatling received a 40 month jail sentence and on June 6, 1995, Walker received a 41 month jail sentence. In calculating Walker's sentence, the district court adjusted Walker's base offense level upward by 8 levels because she was a high-level official.

## II. SUFFICIENCY OF THE EVIDENCE

■ Appellants raise three challenges to the sufficiency of the evidence introduced at trial. Gatling argues that there was insufficient evidence of any agreement between herself and Walker, Jackson or anyone else to support her conviction for conspiracy. Walker, for her part, argues that the evidence introduced at trial varied from the indictment because it established multiple conspiracies rather than the single conspiracy charged and that she was prejudiced by this variance. Walker also claims that the evidence failed to prove that she accepted a bribe rather than a gratuity. In analyzing a claim of insufficient evidence to support a conviction, including a claim that the evidence demonstrated multiple conspiracies rather than a single conspiracy, "[o]ur review is confined to the question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond reasonable doubt.'" *United States v. Washington,* 12 F.3d 1128, 1135–36 (D.C.Cir.) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)), *cert. denied,* —— U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994); *see also United States v. Childress,* 58 F.3d 693, 709 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996).

### A. *Evidence of an Agreement*

■ In order to convict a defendant of conspiracy under 18 U.S.C. § 371, a jury must find that the defendant entered into an agreement with at least one other person to commit a specific offense, in this case bribery against the United States, as well as that the defendant knowingly participated in the conspiracy with the intent to commit the offense and that at least one overt act was committed in furtherance of the conspiracy. *United States v. Wynn,* 61 F.3d 921, 928–29 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995). In order to prove that an agreement existed, the government need only show that the conspirators agreed on "'the essential nature of the plan,'" not that they "agreed on the details of their criminal scheme." *United States v. Treadwell,* 760 F.2d 327, 336 (D.C.Cir.1985) (quoting *Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947)), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). It is well established that an agreement sufficient to support a conspiracy conviction can be inferred from circumstantial evidence. *United States v. Dean,* 55 F.3d 640, 646–47 (D.C.Cir.1995), *cert. denied* —— U.S. ——, 116 S.Ct. 1288, 134 L.Ed.2d 232 (1996); *Treadwell,* 760 F.2d at 333.

■ Gatling's claim of insufficient evidence is without merit, as there was clearly an

adequate basis for the jury to find that an agreement to commit bribery existed between Gatling and either/or both Walker and Jackson. Jackson's statement that Walker and Gatling were splitting the bribe money provided by D.C. residents provided direct evidence of an agreement between Gatling and Walker.[2] In addition, Bufford stated that Walker referred him to Gatling to obtain help in filling out voucher applications and Veronica Bufford and Perkins–Henry testified that Gatling provided the help when they applied for their section 8 subsidies by mail. Given the testimony from various DPAH officials and Pistelli indicating that Chicago residents could not qualify for D.C. section 8 vouchers under HUD and DPAH regulations and that individuals had to apply for section 8 subsidies in person, the jury could well have found that Gatling would not have provided this assistance as part of her normal duties. In addition, Bufford testified that Walker told him to send the $1,000 to Gatling, and Perkins–Henry's canceled check made out to Gatling was introduced into evidence. This evidence provided a more than ample basis for the jury to infer the requisite agreement between Gatling and Walker.

There was even more compelling evidence of an agreement between Gatling and Jackson. Many witnesses testified that Jackson told them they could get subsidies for $500, instructed them on what documents to bring and how to carry the money, and brought them to Gatling who provided them with subsidies in exchange for the $500 payment. One witness testified that she gave her $500 to Jackson, who then put the money in Gatling's pocket. The jury could legitimately have inferred an agreement to commit bribery between Gatling and Jackson from the fact that Jackson spread the word that section 8 subsidies were for sale and repeatedly brought individuals seeking subsidies to Gatling.

### B. *Single v. Multiple Conspiracy*

■ The indictment charged Walker and Gatling with engaging in a single conspiracy to commit bribes which covered the issuance of subsidies to ineligible residents in both Chicago and D.C. Walker contends that the

evidence at trial established at most the existence of two conspiracies, one involving Chicago residents and the other involving D.C. residents. If Walker's claim were correct, then there would have been a variance between the indictment and the evidence offered at trial. Such a variance can be grounds for reversal if it substantially prejudices the defendant, as, for example, if the jury were "substantially likely to transfer evidence from one conspiracy to a defendant involved in another." *United States v. Tarantino,* 846 F.2d 1384, 1391 (D.C.Cir.) (citation omitted), *cert. denied,* 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1988), *and cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988); *see also United States v. Anderson,* 39 F.3d 331, 348 (D.C.Cir.1994) (substantial prejudice from a variance depends on the number of defendants and the likelihood that evidence against one defendant will spill over to another defendant), *rev'd in part on other grounds,* 59 F.3d 1323 (D.C.Cir.) (in banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995). Walker argues that the variance she believes existed substantially prejudiced her because there was no evidence linking her to the D.C. conspiracy and it was extremely likely that the evidence on the D.C. conspiracy, which dominated the trial, spilled over into the jury's consideration of her role in the Chicago conspiracy.

The government argues that this court should review the relationship between the evidence and the single conspiracy charge only for plain error, since Walker did not explicitly argue below that the evidence was only sufficient to prove multiple conspiracies. *Anderson,* 39 F.3d at 347. But while Walker may not have raised the variance argument in express terms, she did argue that the case might involve "two separate conspiracies." The fact that the court granted Walker's motion for a judgment of acquittal on the substantive bribery counts involving D.C. residents and exchanges between the court and counsel in the record suggest that the court itself recognized that the evidence might indicate two conspiracies instead of one. Tr. at 2883–86. Ultimately we need

---

**2.** The admissibility of this statement is discussed   below.

not determine whether Walker preserved the objection below, since whether we review for harmless error or plain error, we find that the evidence was sufficient to support the single conspiracy charge.

▮ In determining whether the evidence supports a finding of a single conspiracy or instead only demonstrates multiple conspiracies, we look at whether the defendants "shared a common goal," any "interdependence between the alleged participants," and "any overlap among alleged participants," such as the presence of core participants linked to all the defendants. *United States v. Graham*, 83 F.3d 1466, 1471 (D.C.Cir. 1996); *Tarantino*, 846 F.2d at 1393. Both the Chicago and D.C. schemes shared a common purpose, namely obtaining money in exchange for section 8 subsidies. The differences between the two schemes—that Buford contacted the appellants by phone to see if he could procure subsidies for two Chicago residents and sent the appellants $1,000 for each subsidy, whereas Jackson brought numerous D.C. residents to DPAH where they gave Gatling $500 in an envelope in exchange for their subsidies—are simply differences in their *modus operandi* and not differences in their underlying objective. Our case law makes clear that a conspiracy's purpose should not be defined in too narrow or specific terms. *See, e.g., Graham,* 83 F.3d at 1471–72 (drug distributing cliques that were in competition with one another were still part of a single conspiracy in part because they shared the common goal of selling one defendant's cocaine for profit); *see also Treadwell,* 760 F.2d at 336 (government does not need to prove that conspirators agreed on specific details of conspiracy). In any event, the two schemes do not appear to have been significantly dissimilar in operation; both involved section 8 subsidies issued through the DPAH office in Washington, D.C. and took advantage of the lax controls at that office over the issuance of subsidies.

In addition, there were significant overlaps between the timing and participants in the Chicago and D.C. schemes. Both occurred during the same period; the Chicago subsidies were provided in June 1991 and March 1992, while the D.C. subsidies were provided on ten occasions between September 1991 and April 1992. *Cf. Childress,* 58 F.3d at 710 (noting that some courts have been reluctant to find a single conspiracy "when certain participants are involved in the enterprise during radically different time periods"). In addition, Walker and Gatling were the main figures in both schemes. As discussed above, the testimony and documentary evidence at trial clearly indicated that Gatling was involved in both the Chicago and D.C. schemes, as well as that Walker was involved in the Chicago scheme. There was also evidence suggesting Walker's participation in the D.C. scheme. Walker made significant cash deposits to her children's accounts during the period, and two D.C. residents who illegally procured section 8 subsidies testified that Walker assisted Gatling in completing the paperwork on their subsidies. More significantly, Knight and his niece, Judy Johnson, testified that Jackson repeatedly stated that Walker and Gatling were splitting the money Gatling collected from D.C. residents.

▮ Walker argues that the district court erred in admitting evidence of Jackson's statements against Walker because the statements constituted inadmissible hearsay. Federal Rule of Evidence 801(d)(2)(E) provides that an out-of-court statement by a coconspirator during and in furtherance of a conspiracy is not hearsay, and therefore evidence of such a statement is admissible to prove the truth of any matter asserted therein. In order to admit a statement under Rule 801(d)(2)(E), the district court must find by a preponderance of the evidence that the person making the statement was a co-conspirator and that the statement was made during and in furtherance of the conspiracy. *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987). This circuit additionally requires that there be independent evidence of the conspiracy apart from the statement, although the content of the statement itself can also be considered in determining whether such independent evidence exists. *United States v. Beckham,* 968 F.2d 47, 50–51 (D.C.Cir.1992); *United States v. Washington,* 952 F.2d 1402, 1407 (D.C.Cir.1991), *cert. denied,* 503 U.S. 1009, 112 S.Ct. 1773, 118

L.Ed.2d 432 (1992). A district court's finding that a statement was made by a coconspirator in furtherance of the conspiracy is reviewed for clear error, provided the objection to the evidence was properly preserved. *United States v. Edmond*, 52 F.3d 1080, 1110 (D.C.Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995).

Here, the clear error standard should be applied. Although the record reveals that objections to the admission of testimony on Jackson's statements were made by Jackson and Gatling and not by Walker, the trial court judge did not require that defendants individually raise objections in this case. At oral argument, the government urged this court to hold that we will review an objection only for plain error if the defendant did not personally raise the objection below, even if the objection was raised by another defendant. Such a hard and fast rule could significantly complicate multidefendant trials, and we decline to adopt it. Trial court judges have discretion to determine whether each defendant must individually object or whether objections raised by one defendant will count as having been raised for all similarly situated defendants. Where a judge does not indicate what her policy will be in express terms during a trial, we will consider objections raised by one defendant to be preserved for other defendants if an examination of the record suggests that this was the approach taken by the judge in practice.[3]

The district court did not clearly err in admitting Jackson's statement against Walker because there was independent evidence indicating Walker and Jackson were co-conspirators. This independent evidence takes two forms. First, there was some evidence, albeit weak, suggesting Walker's participation in the issuance of subsidies to D.C. residents, namely that she made significant unexplained deposits to her children's accounts during the period and that she assisted Gatling with some details of two illegal D.C. subsidies. Second, as discussed above, the common purpose and timing of the Chicago and D.C. schemes and the participation of Gatling in both provide grounds for concluding that the two schemes were one single conspiracy. There is also substantial independent evidence indicating that both Walker and Jackson were participants in this single conspiracy, namely Bufford's testimony that Walker agreed to provide section 8 subsidies to Veronica Bufford and Perkins–Henry and the testimony from numerous D.C. residents that Jackson told them how they could buy section 8 subsidies and brought them to DPAH. This case is therefore distinguishable from *Beckham*, where the only independent evidence of a conspiracy was the fact that the defendant was a close friend of the declarant and was sitting near her when she spoke. *Beckham*, 968 F.2d at 50–51. Furthermore, once the content of Jackson's statements is considered there was clearly a sufficient basis for the court to find by a preponderance of the evidence that Rule 801(d)(2)(E)'s requirements were met. The statements clearly linked Walker to the issuance of subsidies to D.C. residents and were made to reassure individuals that they would in fact receive a subsidy for their $500 payments.

---

3. A closer question is whether the specific objection Walker raises here, that Jackson's statements were not admissible against Walker because there was no independent evidence of a conspiracy between Walker and Jackson, was raised by any defendant below. If not, we would review the district court's decision to admit the evidence for plain error instead of clear error. *See United States v. Olano*, 507 U.S. 725, 732–36, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993) (plain error such as to merit reversal is error that is not only clear but also causes substantial prejudice and seriously affects the fairness, integrity or public reputation of judicial proceedings). The objections raised by Jackson and Gatling were more to the effect that Jackson's statements were not made in furtherance of a conspiracy than that there was no independent evidence of a conspiracy. *See, e.g.,* Tr. at 41–42, 2546, 2860. It is obvious from the record, however, that the district court was chiefly concerned with the issue of whether sufficient independent evidence of a conspiracy was present. Tr. at 2522, 2860. There is no need for us to determine whether Gatling's and Jackson's objections in combination with the district court's actual consideration of the objection raised on appeal serve to trigger review for clear error instead of plain error, since we would still uphold the trial court's decision to admit evidence of the statement under the less deferential clear error standard.

It is true that the Chicago and D.C. schemes were not interdependent in the way that the separate groups involved in many drug "chain" conspiracies are, where each group is dependent on the actions of other groups for the venture as a whole to succeed. *See Childress,* 58 F.3d at 709–10. Here, the principal actions required for the success of the Chicago scheme—identifying individuals seeking subsidies, completing the applications, issuing the subsidies and transferring them to Chicago and receiving money—were unrelated to the actions necessary for the success of the D.C. scheme, and vice versa. Yet even in that regard there was some interdependence between the two schemes; given the overlap in participation and timing and the fact that all illegal subsidies were issued by DPAH, accusations relating to one of the schemes could trigger an investigation that would lead to exposure of both. We have previously found interdependence to exist when the assistance one branch of a conspiracy provides to another is fairly minimal. *Graham,* 83 F.3d at 1471–72 (interdependence exists when members of different and competing drug cliques occasionally assisted one another, even though this assistance was not significant to each clique's success); *cf. United States v. Macchia,* 35 F.3d 662, 667–68 (2d Cir.1994) (in determining whether two conspiracies amount to the same offense for double jeopardy purposes, court considers factors such as common purpose, overlap of participants and time, location where acts occurred, and interdependence but "no dominant factor or single touchstone" determines if two conspiracies are one offense); *United States v. Daily,* 921 F.2d 994, 1008 (10th Cir.1990) ("Generally, it is sufficient for purposes of a single-conspiracy finding that a conspirator knowingly participated with a core conspirator in achieving a common objective with knowledge of the larger venture."), *cert. denied,* 502 U.S. 952, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991).

In sum, we find that this evidence of the common purpose, participants, timing and interdependence of the Chicago and D.C. schemes more than sufficient for a reasonable juror to conclude that a single conspiracy existed.

### C. *Evidence of Accepting Bribes or Accepting Gratuities*

Finally, there was also sufficient evidence for the jury to find that Walker conspired to accept bribes rather than gratuities. Bribery is defined as occurring when "a public official ... corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for another person ... in return for: (A) being influenced in the performance of any official act." 18 U.S.C. § 201 (1994). This court has held that "[p]ayments to a public official for acts that would have been performed in any event ... are probably illegal gratuities rather than bribes" and that bribery implies a *quid pro quo. United States v. Campbell,* 684 F.2d 141, 148 (D.C.Cir.1982); *United States v. Brewster,* 506 F.2d 62, 72 (D.C.Cir. 1974). A central difference between accepting a bribe and accepting a gratuity is the degree of culpable intent on the part of the recipient; to convict a defendant for accepting a bribe a jury must find that the defendant acted "corruptly," whereas to convict for accepting a gratuity the jury need only find that the defendant acted "knowingly and willingly." *Campbell,* 684 F.2d at 149–50. Given the equation of bribery with a *quid pro quo,* "corruptly" in the context of the bribery statute would appear to mean that the defendant accepts money with the specific intent of performing an official act in return.

The evidence of bribery is weakest in regard to the Chicago vouchers. Bufford testified that when he spoke to Walker about obtaining a section 8 subsidy for his former wife Walker did not solicit payment. He also indicated that she agreed to provide the subsidy before he offered her $1,000. The fact that Walker was offered the bribe after she agreed to provide the section 8 subsidy does not, however, in itself preclude a finding that Walker was providing the voucher in exchange for money. Timing is not determinative of whether a payment constitutes a bribe or a gratuity, since "[t]he statute proscribes offers and promises of bribes as well as the giving of bribes, and it is only logical that in certain situations the bribe will not actually be conveyed until the act is done." *Campbell,* 684 F.2d at 148.

Nonetheless, Bufford's testimony regarding his conversation with Walker could be more suggestive of a gratuity than a bribe. There is, however, additional evidence that is more probative of bribery. To begin with, it is significant that Walker had a second conversation with Bufford and once more agreed to provide a section 8 subsidy, this time to Perkins–Henry. Although Bufford again offered payment after Walker had agreed to provide the subsidy, the jury could infer that Walker acted in the expectation that Bufford would offer $1,000 for this second subsidy as he had for the first. *See Campbell,* 684 F.2d at 149 (distinction between bribery and a gratuity has little significance in the context of an ongoing scheme). Bufford's testimony to the effect that Walker discussed with him where he should send the money bolsters this inference, and as the bribery statute makes clear, it is irrelevant that Walker appeared to accept payment for Gatling rather than for herself. In addition, there was substantial, uncontroverted evidence of bribery in regard to subsidies illegally issued to D.C. residents, and this evidence alone would be sufficient to sustain Walker's bribery conspiracy conviction since, as we have discussed above, the Chicago and D.C. schemes were part of the same conspiracy. Many of the D.C. residents who illegally obtained subsidies testified that they were told they had to pay $500 for the subsidy and that they gave Gatling $500 before she provided them with their section 8 vouchers or certificates.

In sum, we conclude that there was sufficient evidence of an agreement, of a single conspiracy, and of bribery to support appellants' bribery conspiracy convictions.

### III. MISCELLANEOUS CHALLENGES

Walker raises several additional challenges to the conduct of the trial and her sentence, none of which requires extensive discussion. These challenges can be grouped into four categories: evidentiary issues; prosecutorial misconduct in summation; jury instructions; and sentence enhancement.

A. *Evidentiary Issues*

Walker raises two challenges to the evidence introduced at trial in addition to her argument, discussed above, that Jackson's statements constituted inadmissible hearsay. She argues that the district court erred in allowing the government to put on a new expert witness during rebuttal and in allowing testimony regarding prior consistent statements of other witnesses when no charge of recent fabrication or improper motive had been made. Neither argument is successful.

Pistelli's expert testimony was clearly appropriate rebuttal evidence; Walker had testified that her discretionary control over 10 percent of the subsidies authorized her to provide subsidies to Chicago residents and Pistelli's testimony went directly to refuting this claim. *United States v. Carter,* 70 F.3d 146, 149 (D.C.Cir.1995). Walker suggests that new expert testimony is *per se* inappropriate rebuttal evidence, but we find no support for this proposition in the case law or in the rules of evidence. A trial court has broad discretion in determining whether to admit or exclude expert testimony. *United States v. Clarke,* 24 F.3d 257, 268 (D.C.Cir.1994); *United States v. Hall,* 969 F.2d 1102, 1109–10 (D.C.Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992). If a court determines that expert testimony might be helpful to the jury, it should allow the testimony unless it finds that under Rule 403 the unfair prejudice caused by the testimony outweighs its probative value. FED. R. EVID. 403, 702; *Hall,* 969 F.2d at 1109. Here, the only unfair prejudice that could have resulted from Pistelli's testimony stemmed from the fact that it was offered in rebuttal after Walker's defense had rested, but the district court avoided this potential prejudice by telling Walker she could also present additional expert testimony, which she chose not to do.

On a few occasions, the trial court allowed witnesses to testify regarding prior statements made to them by other non-party witnesses. For example, one of the government investigators testified about statements made to her by a D.C. resident who had illegally obtained a section 8 subsidy. Tr. at 120–21, 125–26. The court ruled that this testimony was admissible because the individuals who made the statements

were also witnesses at the trial and because the statements were being offered to provide background. The court's first justification for allowing the statements is mistaken; testimony regarding out-of-court statements offered for their truth can still constitute inadmissible hearsay even if the declarant is also a witness at trial. *See* Fed.R.Evid. 801(d)(1) (prior statement of a witness is not hearsay only if prior statement is inconsistent with witness' testimony at trial, consistent with the witness' testimony and offered to rebut charge of recent fabrication or improper motive, or represents a statement of identification). Consequently, such statements can be admitted only if they fall under one of the exclusions or exceptions to the hearsay rule. But any error that the court made in this regard was at most harmless. The district court's second justification for admitting the statements, that they were offered simply to provide background for the rest of the witnesses' testimony, is valid; for instance, the D.C. resident's statements recounted by the investigator were offered not for their truth but simply to explain the investigator's actions and set the context of the investigation. Even if on some of the other occasions the court mistakenly allowed in evidence of witnesses' prior consistent statements to prove their truth, their effect could only be harmlessly cumulative in light of the substantial evidence of Walker's and Gatling's guilt properly admitted at trial. *Clarke,* 24 F.3d at 267.

## B. *Prosecution's Comments in Summation*

▮▮▮▮ A conviction will be reversed for improper comments by the prosecutor only if the statements substantially prejudiced the defendant. In determining whether substantial prejudice has occurred, the court looks to the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the error. *Childress,* 58 F.3d at 715–16 (quoting *United States v. North,* 910 F.2d 843, 894 (D.C.Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991)). As part of his closing argument to the jury, the prosecutor stated that the defendants' alleged actions constituted "blatant exploitation of the disadvantaged members of society, people that are trying to

get a leg up" and urged the jury to do "justice" and "tell all the defendants, 'You can't get away with that. You can't cheat people out of their Section 8's.' " Tr. at 3123, 3287. It is, first of all, not at all apparent that these remarks were improper. Although "[a] prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking[,] ... a request that the jury 'condemn' an accused for engaging in illegal activity is not constitutionally infirm, so long as it is not calculated to excite prejudice or passion." *United States v. Monaghan,* 741 F.2d 1434, 1441–42 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985). We grant great deference to the district court's judgment as to "[w]hether the prosecutor has struck a foul blow instead of just a hard one." *Dean,* 55 F.3d at 665. But even if the prosecutor's comments were inappropriate, they did not substantially prejudice Walker since the court twice instructed the jurors that the lawyers' closing arguments only reflected the positions of the government and the defense and that they could only convict Walker and the other defendants based on the evidence. Tr. at 3128, 3288; *see also Childress,* 58 F.3d at 716 (prosecutorial excess in summation cured by instruction); *Dean,* 55 F.3d at 665–66 (same).

## C. *Jury Instruction Challenges*

▮▮▮▮ Walker argues that the court erred by not providing a jury instruction informing the jury that it could not convict the defendants on the single conspiracy charge if it found that the evidence demonstrated multiple conspiracies rather than a single conspiracy. As an initial matter, we note that our determination that the evidence was sufficient to support the jury's finding of a single conspiracy does not obviate the need to decide whether a multiple conspiracy instruction should have been given, "for if record evidence supports the existence of multiple conspiracies, the district court should have so instructed the jury" upon request. *Graham,* 83 F.3d at 1472. Since neither Walker nor any other defendant asked for this instruction below, we review the court's

failure to give a multiple conspiracy instruction for plain error under Rule 52(b) of the Federal Rules of Criminal Procedure.[4] *United States v. Sayan,* 968 F.2d 55, 62 (D.C.Cir.1992). The Supreme Court has held that a plain error sufficient to merit reversal under Rule 52(b) exists only if the defendant has shown a clear or obvious error occurred that affected substantial rights, which the Court specified means that the error was prejudicial and actually affected the outcome below. *Olano,* 507 U.S. at 735–36, 113 S.Ct. at 1778–79. Further, the error must be one that " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Id.* at 736, 113 S.Ct. at 1779 (quoting *United States v. Atkinson,* 297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

▮ The trial court did not commit plain error in not issuing a multiple conspiracy instruction. As discussed above, the evidence clearly connected Walker to both the Chicago and D.C. conspiracies and supported the single conspiracy charge. Walker maintains that the evidence also suggested multiple conspiracies. We need not determine if Walker's claim is correct, because we find that the evidence of a single conspiracy and of Walker's involvement in it was substantial, and therefore the lack of a multiple conspiracy instruction cannot be said to have affected the outcome below or to call the fairness of the trial into question. *See United States v. Debango,* 780 F.2d 81, 84 (D.C.Cir.1986) ("failure to give multiple-conspiracy instruction was not plain error, given that the government's evidence was clearly sufficient to support a finding that appellant and his co-defendants were engaged in a single conspiracy"); *see also Tarantino,* 846 F.2d at 1403 ("in evaluating whether … instructions constitute[ ] plain error, we may ourselves evaluate the strength or weakness of the evidence against the defendants").[5]

Walker also maintains that the district court erred in the instruction it gave the jury on Walker's false statements charge. The court instructed the jury that it need only determine that Walker knowingly and willfully made or used a false document or writing containing the false statements, and held that the two other elements of false statements offense, that the false statement must be material and relate to a matter within the jurisdiction of the United States, were questions of law for the court to decide. Tr. at 3010–11, 3342–43; *see also* 18 U.S.C. § 1001. In *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), decided after Walker and Gatling were convicted, the Supreme Court held that the materiality of a false statement was a question for the jury. *Id.* at ——, 115 S.Ct. at 2320. Since the government concedes that Walker's false statement conviction should be vacated, Gov. Br. at 49 n.19, there is no need for us to determine whether *Gaudin* is a supervening decision such as to excuse Walker from raising this issue below. *Washington,* 12 F.3d at 1138–39.

### D. *Sentence Enhancement*

▮ Walker's final challenge is that the district court erred in enhancing her sentence on the grounds that she was a high-level official. The Sentencing Guidelines assign a base offense level of 10 to bribery offenses, and provide that this base offense level should be increased by 8 levels "[i]f the offense involved a payment for the purpose of influencing … any official holding a high-level of decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(2)(B). The dis-

---

4. Walker maintains that harmless error review should apply, because there were discussions between counsel and the court on whether the evidence demonstrated a single conspiracy or multiple conspiracies and it would have been futile for Walker to ask for a multiple conspiracy instruction once the court denied Walker's motion for a judgment of acquittal on the single conspiracy charge. However, whether there is sufficient evidence to allow the single conspiracy charge to go to the jury is a different question from whether a multiple conspiracy instruction should also be given, and if anything the fact that the court granted Walker's motion for judgment of acquittal on the substantive bribery charges relating to the D.C. residents' subsidies should have encouraged Walker to ask for a multiple conspiracy instruction.

5. Walker also objects to the fact that the court included overt acts relating to the D.C. scheme in its instruction on the conspiracy count. Since there was evidence linking Walker to the D.C. scheme, the inclusion of the D.C. overt acts was not error.

trict court's determination that Walker was a high-level official is an application of the Sentencing Guidelines to the facts to which we give "due deference" on review. *United States v. Kim,* 23 F.3d 513, 517 (D.C.Cir. 1994).

 Giving due deference, we find that the district court's determination that Walker was a high-level official was not error. As Chief of the Section 8 Division, Walker supervised a 23–person staff, ran the section 8 program and had authority over substantial amounts of money in housing subsidies. While regulations may have curtailed Walker's ability to issue section 8 subsidies as she chose, she had the power to issue subsidies without the need for further authorization or review. Her position made her the top official within the Section 8 Division and lowered the possibility that the section 8 subsidies she had illegally issued would be uncovered. The application note to section 2C1.1 indicates that the key inquiry in determining its applicability is the "level of responsibility" the official exercises and explicitly lists "agency administrators" as the type of official to whom the guideline applies, a status Walker certainly held as Chief of the Section 8 Division. Application Note 1, U.S.S.G. § 2C1.1 (1995).[6] Other courts have found government employees occupying positions of power and responsibility similar to Walker's to be high-level officials. *United States v. Matzkin,* 14 F.3d 1014, 1021 (4th Cir.1994) (branch head who supervised other engineers was high-level official because he had "responsibility for technical aspects of major procurements," access to valuable inside information and influence on purchasing decisions), *cert. denied,* —— U.S. ——, 116 S.Ct. 175, 133 L.Ed.2d 115 (1995); *United States v. Lazarre,* 14 F.3d 580, 582 (11th Cir.1994) (immigration official who had power to grant parole was high-level official).

In sum, Walker's challenges to the court's evidentiary rulings, the prosecutor's statements in summation, the failure to give a jury instruction on multiple conspiracies and

her sentence enhancement are not successful. We vacate only Walker's conviction for making a false statement under 18 U.S.C. § 1001.

## CONCLUSION

We hold that there was sufficient evidence to sustain Walker's and Gatling's convictions for engaging in a single conspiracy to commit bribery, and affirm these convictions and Walker's sentence. We also reject Walker's additional challenges, except that we vacate her conviction for making false statements under 18 U.S.C. § 1001.

*So ordered.*

---

**6.** It is also noteworthy that Walker became Acting Administrator of the Subsidized Housing Administration, in addition to Chief of the Section 8 Division, at some point in 1992. Since the record does not clearly indicate whether she was Acting Administrator at the time of the bribery conspiracy, however, we do not rely on this fact in determining that section 2C1.1 applies.